Nicholas P. Heinke
Ian J. Kellogg
Applications pursuant to LR IA 11-3 to be filed
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, Colorado 80294
(303) 844-1000
heinken@sec.gov
kelloggi@sec.gov

*Counsel for Plaintiff U.S. Securities and Exchange Commission*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION, CHRISTOPHER DOUBEK, and JOSEPH WALSH,<br><br>Defendants. | Case No. 22-CV-1279<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Alpine Securities Corporation ("Alpine"), Christopher Doubek ("Doubek"), and Joseph Walsh ("Walsh") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1. In May and June 2019, Alpine, a registered broker-dealer, seized its own retail customers' securities without authorization or notice in an improper attempt to force customers to close their Alpine brokerage accounts. The unauthorized transactions were orchestrated by Alpine's then-Chief Executive Officer and Chief Compliance Officer, Christopher Doubek, and its Chief Operations Officer, Joseph Walsh.

2. Specifically, Alpine, through Doubek and Walsh: (1) sold approximately $268,000 in

customer securities to Alpine's own proprietary account without customer notice or approval, on the ground that Alpine deemed securities valued $400 to $1500 "worthless;" and (2) deemed 545 customer accounts "abandoned"—contrary to the terms of its customer agreements—and transferred approximately $54 million worth of securities in those accounts into Alpine-controlled state escheatment accounts.

3. Alpine eventually returned these securities to its customers, but not until it received numerous customer complaints and inquiries from the Financial Industry Regulatory Authority ("FINRA").

4. As a result of the conduct described in this Complaint, Defendants violated and, unless restrained and enjoined, will continue to violate, the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], as well as Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]. Defendant Alpine also violated Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. §78o(c)(1)], and Doubek and Walsh aided and abetted Alpine's violations.

5. The SEC seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; civil penalties against each of the Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; an order barring the Defendants from participating in any offering of a penny stock pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)]; and any other relief the Court may deem appropriate.

## JURISDICTION AND VENUE

6. The SEC brings this action pursuant to authority conferred on it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

7. The Court has jurisdiction over this action pursuant to Sections 21(d)(3)(A) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(A) and 78aa(a)] and Section 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)].

8. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] because Defendant Christopher Doubek and Alpine's owner reside in this district.

## DEFENDANTS

10. **Alpine Securities Corporation** is a Utah corporation headquartered in Salt Lake City, Utah. Alpine is a self-clearing broker-dealer and has been registered with the SEC since 1984. Alpine is owned by a Nevada limited liability company located in Stateline, Nevada.

11. **Christopher Doubek**, age 60, resides in Henderson, Nevada. Doubek joined Alpine as its sole board member in December 2018, became its Chief Executive Officer ("CEO") in April 2019, and became its Chief Compliance Officer ("CCO") in May 2019. Doubek was registered with FINRA as a broker associated with Alpine until his termination from Alpine in June 2021.

12. **Joseph Walsh**, age 64, resides in Longview, Texas. Since September 2018, Walsh has served as Alpine's Chief Operations Officer ("COO"). Walsh served as Alpine's interim CEO from December 2018 to March 2019. Walsh is registered with FINRA as a broker associated with Alpine.

## FACTS

I. **Alpine's Efforts to Close Retail Customer Accounts**

13. In 2018, Alpine began to take steps to discontinue its retail brokerage business and close retail customers' accounts, including increasing fees and requesting that customers close their accounts. Alpine's most significant fee increase, instituted in August 2018, raised its account fee from $100 per year to $5,000 per month. Part of Alpine's rationale for the 600-fold fee increase was to induce retail customers to close their accounts.

3

14. In February 2019, Alpine notified customers that Alpine considered securities positions valued at less than $400 "worthless." Alpine's February 2019 monthly brokerage statements included a letter dated February 28, 2019, stating that customers should contact the firm via email to instruct Alpine how to close their accounts and that if direct instructions were not received by May 1, 2019, Alpine would liquidate positions to cover fees. The letter stated that for positions worth less than $400, customers should "submit a Worthless Securities Form found on our website . . . . Positions worth less than $400 or have [sic] no active trading market, liquidation may incur greater fees and commissions than the position value." The letter was prepared by Doubek and Walsh in their official capacities at Alpine.

15. On March 15, 2019, Alpine sent certain customers with positions worth less than $400 a letter entitled "NEGATIVE RESPONSE WORTHLESS SECURITY LETTER" stating that "[a]ll your shares of the security listed above will be sold to our 'worthless securities account' for $0.01 proceeds" unless the customer objected by signing an objection and mailing it to Alpine. Several customers completed the objections. The letter was prepared by Walsh and reviewed and approved by Doubek in their official capacities at Alpine.

16. Alpine's March and April 2019 monthly brokerage statements also included letters, dated March 31, 2019 and April 30, 2019, respectively, stating that customers should contact the firm via email to instruct Alpine how to close their accounts and that if direct instructions were not received, Alpine would liquidate positions to cover fees. The letters also provided that for positions worth less than $400, customers should "submit a Worthless Securities Form found on our website . . . positions worth less than $400 or have [sic] no active trading market, liquidation may incur greater fees and commissions than the position value." These letters were prepared by Doubek and Walsh in their official capacities at Alpine.

17. These notices to customers did not disclose any plans to deem securities valued at more than $400 "worthless," nor did they disclose that Alpine might take action to deem accounts "abandoned," beyond the terms disclosed in Alpine's agreements with its customers.

4

**II.    In May 2019, Alpine Sold and Purchased Customer Securities Worth $400 to $1500 Without Authorization or Notice**

18.     By May 2019, Alpine was dissatisfied with the number of retail customer accounts that remained open. As a result, on May 28, 29, and 30, 2019, Alpine sold all customers' securities positions that Alpine valued at $1500 or less and purchased them for one penny per position through Alpine's "worthless securities" account that Alpine owned and controlled.

19.     The penny per position price Alpine paid bore no relationship to the actual value of each position. In fact, many of the "worthless" positions had active markets, possessed value, and even listed on a national securities exchange such as NASDAQ or NYSE. In several instances, Alpine took customer securities as "worthless" on or around the very same day that it liquidated other positions in those same securities into the market for other customers.

20.     In all, Alpine sold from its customer accounts, and purchased for its own account, 287 securities positions, each of which was worth between $400 and $1500. Alpine subsequently valued those "worthless" securities at approximately $268,000.

21.     Alpine did not have customer authorization to sell these securities and did not provide customers with positions worth $400 to $1500 with any prior notice that it might sell those securities as "worthless" and purchase them for a penny per position.

22.     At the time of these transactions, Alpine's agreements with its customers did not give Alpine the discretion to sell customers' securities without authorization.

23.     Doubek, in his capacity as CEO, made the decision to deem all positions worth $1500 or less as "worthless" and instructed Walsh, as COO, to sell all positions worth less than $1500 to Alpine.

24.     Walsh entered the trades whereby customers' securities positions valued at less than $1500 were sold to Alpine for a penny per position.

25.     At the time of the transactions, Doubek and Walsh knew or were reckless in not knowing that Alpine's customers had not authorized Alpine to sell their securities positions worth $400 to $1500 for $0.01 and that Alpine had not notified its customers that positions worth $400 to $1500 would be sold to Alpine as "worthless."

26. Doubek and Walsh were responsible for preparing and reviewing customer notices and did not provide customers with notice that positions worth $400 to $1500 would be deemed worthless or that Alpine would purchase such positions for a penny per position.

27. At the time of these sales, Doubek was the CEO, CCO, and a registered representative of Alpine and was acting for the benefit of Alpine and within the scope of his employment. Accordingly, his conduct and mental state can be imputed to Alpine.

28. At the time of these sales, Walsh was the COO and a registered representative of Alpine and was acting for the benefit of Alpine and within the scope of his employment. Accordingly, his conduct and mental state can be imputed to Alpine.

### III. In June 2019, Alpine Improperly Transferred Additional Customer Securities

29. In June 2019, Defendants engaged in additional, unauthorized transactions to close out retail customers' accounts.

30. Alpine's customer agreements provided that accounts with no activity or customer contact for three years would be deemed abandoned:

> If a deposit or withdrawal has not been made on the account, you have not otherwise indicated an interest in the account, or Alpine has had no other contact with you within three (3) years . . . the account will presumed to be abandoned. Funds in abandoned accounts will be remitted in accordance with state law. Once funds have been turned over to the state, Alpine has no further liability to you for such funds. If you choose to reclaim such funds, you must apply to the appropriate state agency.

31. Despite the three-year threshold, in early June 2019, Alpine declared <u>all</u> remaining retail accounts "abandoned" without conducting any analysis into whether there had been account activity or customer contact in the last three years, unless the customer had affirmatively contacted and was actively working with an Alpine representative to transfer or liquidate their securities.

32. Between June 7 and June 24, 2019, Walsh, with Doubek's knowledge and approval, transferred 645 securities positions from 545 customers' accounts into state escheatment accounts under Alpine's control. The estimated value of the securities transferred was $54 million.

33. The transfers of securities from customer accounts into escheatment accounts under

Alpine's control were transactions in securities. The Alpine accounts that held the stock following the transfers were under Alpine's exclusive control. Following the transfers, the customers' securities no longer appeared in their accounts and Alpine's stock record no longer listed the customers as the owners of the securities.

34. Alpine did not have customer authorization to transfer these securities.

35. Doubek and Walsh knew or were reckless in not knowing that Alpine did not have customer authorization to transfer these securities.

36. Alpine, Doubek, and Walsh did not determine whether the accounts were "abandoned" under the terms of the customer agreements, and did not conduct any review into the last account activity or customer contact prior to declaring the accounts "abandoned." If Alpine, Doubek, or Walsh had taken such steps, they would have determined that dozens of accounts deemed "abandoned" in fact had activity in the several months prior to June 2019.

37. At the time of the transactions, Doubek and Walsh knew or were reckless in not knowing the terms of Alpine's customer agreements.

38. At the time of the transactions, Doubek and Walsh knew or were reckless in not knowing that the transfers of securities from customer accounts to state escheatment accounts was contrary to Alpine's customer agreements.

39. At the time of these transactions, Doubek was the CEO, CCO, and a registered representative of Alpine and was acting for the benefit of Alpine and within the scope of his employment. Accordingly, his conduct and mental state can be imputed to Alpine.

40. At the time of these transactions, Walsh was the COO and a registered representative of Alpine and was acting for the benefit of Alpine and within the scope of his employment. Accordingly, his conduct and mental state can be imputed to Alpine.

**IV.    In June 2019, Alpine Notified Customers that it had Taken their Securities**

41. In mid-June 2019, Alpine sent customers a letter (dated May 31, 2019) that stated: "Please be advised that all positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value. These positions have been removed via a worthless security sell transaction." Walsh drafted the letter and Doubek reviewed

and approved it in their official capacities at Alpine.

42. In that letter, Alpine also stated: "All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state." This letter was not sent to customers until after Alpine had begun transferring securities into Alpine's state escheatment accounts.

43. In late June 2019, Alpine also told customers – via an automated email response – that their accounts were deemed "abandoned" and that the securities in their accounts had been sent to their respective states and directed customers to the states to reclaim their assets.

## V. Alpine's Customers and FINRA Contact the Firm

44. After the transactions described above had occurred, many of Alpine's customers contacted Alpine to complain and/or request that the unauthorized transactions be reversed. For example, on June 5, 2019, one customer wrote:

> I finally got access to my account again and saw that Alpine had unceremoniously liquidate[d] my 1.8 million shares of LOGL as worthless!!!! WTF!!!!!! How do you get away with liquidating stock and closing an account without discussing with the client any changes to your process. I want the account reinstated or you can sell the shares at today's market price of $.0009 and snd [sic] me the proceeds of sale before closing the account. I did not authorize any of this to be done without my permission. I expect a call from your ioffice [sic] immediately!!!!

45. On June 11, 2019, after Alpine declared a customer's 200 shares of a NASDAQ listed stock that was trading at approximately $3.00 per share as "worthless," the customer wrote to Alpine: "I disagree with the fact that you sold it for 0 when it is a Nasdaq traded company."

46. Another customer, after being told that his accounts had been closed and held no cash or security value, wrote to Alpine on June 21, 2019 that one of his accounts had over $500,000 in securities and demanded an immediate explanation and an "immediate accounting," which he never received.

47. Another customer, after receiving the automated message that his account was abandoned, wrote on June 25, 2019: "That makes no sense. . . . The Alpine rep who help [sic] sell . . . shares on 6/18 asked where the check should be mailed to."

48. Another customer, after receiving the automated message, wrote simply: "This is wrong."

49. Partially in response to these customer complaints, FINRA opened an investigation, requested documents, and began taking testimony. Only after Alpine received numerous customer complaints and inquiries from FINRA did Alpine return the "worthless" securities and the securities transferred from the "abandoned" accounts to its customers.

**VI.    Doubek and Walsh Aided and Abetted Alpine's Unlawful Transactions**

50. As alleged above, Alpine, as a broker dealer, effected securities transactions by means of manipulative, deceptive, or fraudulent devices, in violation of Section 15(c)(1)(A) of the Exchange Act.

51. As alleged above, Doubek and Walsh knew, or were reckless in not knowing, of Alpine's unlawful securities transactions (1) deeming securities worth between $400 and $1500 "worthless" and selling them to Alpine's worthless securities account and (2) deeming certain other accounts "abandoned" and transferring those securities into escheatment accounts under Alpine's control.

52. Doubek substantially assisted Alpine's misconduct by, among other things:

    a. Making the decision to deem all positions worth between $400 and $1500 "worthless" and instructing Walsh to sell all positions worth between $400 and $1500 to Alpine;

    b. Failing to receive customer authorization before Alpine sold customers' positions valued by Alpine at $400 to $1500 and purchased those positions for a penny each in its own account;

    c. Preparing and reviewing customer notices with respect to positions valued at less than $400 that did not include notice that positions worth $400 to $1500 would also be deemed worthless or that Alpine would purchase such positions for a penny per position;

    d. Failing to provide customers any notice that positions worth $400 to $1500 would be deemed worthless or that Alpine would purchase such positions for a penny per position;

    e. Failing to determine whether the accounts were "abandoned" under the terms of the customer agreements or otherwise obtain customer approval before Alpine deemed accounts

abandoned and transferred securities out of those customer accounts; and

   f. Knowingly approving Walsh's transfer of securities positions from customers' accounts deemed "abandoned" into state escheatment accounts under Alpine's control.

53. Walsh substantially assisted Alpine's misconduct by, among other things:

   a. Entering the trades whereby customers' securities positions valued between $400 and $1500 were sold to Alpine for a penny per position;

   b. Failing to receive customer authorization before entering into those trades;

   c. Preparing and reviewing customer notices with respect to positions valued at less than $400 that did not include notice that positions worth $400 to $1500 would also be deemed worthless or that Alpine would purchase such positions for a penny per position;

   d. Failing to provide customers any notice that positions worth $400 to $1500 would be deemed worthless or that Alpine would purchase such positions for a penny per position;

   e. Failing to determine whether the accounts were "abandoned" under the terms of the customer agreements or otherwise obtain customer approval before Alpine deemed accounts abandoned and transferred securities out of those customer accounts; and

   f. Transferring securities positions from customers' accounts deemed "abandoned" into state escheatment accounts under Alpine's control.

### FIRST CLAIM FOR RELIEF
(All Defendants)
Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) and (c)]

54. The SEC realleges and incorporates by reference its prior allegations.

55. By engaging in the conduct alleged in paragraphs 1-28, 41, and 44-49, each of the Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

56. By engaging in the conduct described above, each of the Defendants violated, and

unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
(All Defendants)
Violations of Sections 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)(1)]

57. The SEC realleges and incorporates by reference its prior allegations.

58. Through the conduct alleged in paragraphs 1-28, 41, and 44-49 of this Complaint, each of the Defendants, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly employed devices, schemes, or artifices to defraud.

59. By engaging in the conduct described above, each of the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
(Against Alpine)
Violations of Section 15(c)(1)(A) of the Exchange Act
[15 U.S.C. § 78o(c)(1)(A)]

60. The SEC realleges and incorporates by reference its prior allegations.

61. At all relevant times, Alpine was a registered broker dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

62. Through the conduct alleged in this Complaint, Alpine, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of, securities, by means of a manipulative, deceptive, or other fraudulent device or contrivance.

63. By engaging in the conduct described above, Alpine violated, and unless restrained and enjoined will continue to violate, Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)].

**FOURTH CLAIM FOR RELIEF**
(Against Doubek and Walsh)
**Aiding and Abetting Violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)]**

64. The SEC realleges and incorporates by reference its prior allegations.

65. As alleged above, Defendant Alpine violated Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. §78o(c)(1)(A)].

66. Through the conduct alleged in this Complaint, Defendants Doubek and Walsh knowingly or recklessly provided substantial assistance to Alpine in furtherance of its violations alleged above.

67. By engaging in the conduct described above, Defendants Doubek and Walsh aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. §78o(c)(1)(A)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC demands a jury trial on all issues triable to a jury and respectfully requests that the Court:

**I.**

Find that each of the Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining: Defendant Alpine from violating Sections 10(b) and 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) and §78o(c)(1)(A)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Defendants Doubek and Walsh from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and from aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. §78o(c)(1)(A)].

**III.**

Order each of the Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

**VI.**

Enter an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 21(d) of the Exchange Act [15 U.S.C § 78u(d)] and Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 10, 2022

Respectfully Submitted,

*/s/ Nicholas Heinke*
Nicholas Heinke*
Ian J. Kellogg*
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294
(303) 844-1000
heinken@sec.gov
kelloggi@sec.gov

*Counsel for Plaintiff*

*Applications pursuant to LR IA 11-3 to appear for an agency of the United States to-be submitted