1  Ian J. Kellogg
   James P. McDonald
2  Jacqueline M. Moessner
   Admitted pursuant to LR IA 11-3
3  Securities and Exchange Commission
   1961 Stout Street, Suite 1700
4  Denver, Colorado 80294
   (303) 844-1000
5  (303) 844-1000
6  kelloggi@sec.gov
   mcdonaldja@sec.gov
7  moessnerj@sec.gov
8
9  *Counsel for Plaintiff U.S. Securities and Exchange Commission*

10        **UNITED STATES DISTRICT COURT**
               **DISTRICT OF NEVADA**
11

12  UNITED STATES SECURITIES AND          Case No. 2:22-cv-01279-RFB-MDC
    EXCHANGE COMMISSION,
13
14          Plaintiff,                     **PLAINTIFF'S MOTION FOR SUMMARY
                                            JUDGMENT AND STATEMENT OF
15  v.                                      UNDISPUTED MATERIAL FACTS AND
                                            MEMORANDUM IN SUPPORT**
16  ALPINE SECURITIES CORPORATION,
    CHRISTOPHER DOUBEK, and
17  JOSEPH WALSH,                           **HEARING REQUESTED**
18          Defendants.
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.  INTRODUCTION ...............................................................................................1

II.  PROCEDURAL HISTORY...............................................................................2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS .................................2

    A.  Relevant Background .............................................................................2

    B.  The Forced Sales of Supposedly Worthless Securities..........................5

    C.  The "Abandoned" Securities Transfers ................................................11

IV.  SUMMARY JUDGMENT STANDARD...........................................................15

V.  ARGUMENT ...................................................................................................15

    A.  Claims One and Two – Defendants Violated Section 10(b) and
        Rules 10(b)-5(a) & (c) of the Exchange Act and Section 17(a)(1)
        of the Securities Act. .............................................................................15

        1.  Defendants Employed Deceptive Conduct to Falsely
                Deem and Sell Without Authorization Hundreds
                of Securities as "Worthless" ......................................................17

        2.  Defendants Acted with Scienter................................................20

                a.  Doubek and Walsh Each Acted with the Intent to Deceive
                    Customers and in Total Disregard of Their Obligations....................21

                b.  Doubek and Walsh's Scienter is Imputed to Alpine ...........................22

        3.  The Conduct Was in Connection with a Securities Sale............22

        4.  Defendants Used Means of Interstate Commerce.......................22

    B.  Claims Three and Four – Alpine Violated § 15(c)(1)(A) of the Exchange
        Act and Doubek and Walsh Aided and Abetted that Violation ...........23

        1.  Alpine Violated § 15(c)(1)(A) of the Exchange Act .................23

                a.  The Transfers of "Abandoned" Positions Involved Fraud,
                    Deceit, and Lies ................................................................................25

                b.  Alpine Acted with Scienter.................................................................27

c.  The Conduct Concerned Effecting Transactions or
Attempting to Induce Customer Sales ................................................28

d.  Alpine Used Means of Interstate Commerce ......................................29

2.  Doubek and Walsh Aided and Abetted Alpine's
Section 15(c)(1)(A) Violation......................................................29

VI.    CONCLUSION.............................................................................................30

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Affiliated Ute Citizens of Utah v. United States,*
   406 U.S. 128 (1972) ...................................................................................22

4

5

*Brophy v. Redivo,*
   725 F.2d 1218 (9th Cir. 1984) ...................................................................20

6

*Caiola v. Citibank, N.A.,*
   295 F.3d 312 (2d Cir. 2002) .......................................................................17

7

8

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ...................................................................................15

9

*Cruse v. Equitable Sec. of NY, Inc.,*
   678 F. Supp. 1023 (S.D.N.Y 1987) ...........................................................17

10

11

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976) ..............................................................................20, 24

12

*Gebhart v. SEC,*
   595 F.3d 1034 (9th Cir. 2010) ...................................................................20

13

14

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.,*
   63 F.4th 747 (9th Cir. 2023) ......................................................................21

15

*Herman v. T. & S. Commodities, Inc.,*
   578 F. Supp. 601 (S.D.N.Y. 1983) ............................................................21

16

17

*In re Alphabet, Inc. Sec. Litig.,*
   1 F.4th 687 (9th Cir. 2021) ........................................................................16

18

19

*In re ChinaCast Educ. Corp. Sec. Litig.,*
   809 F.3d 471 (9th Cir. 2015) .....................................................................22

20

*In re NVIDIA Corp. Sec. Litig.,*
   768 F.3d 1046 (9th Cir. 2014) ..............................................................20, 27

21

22

*Johnson v. Poway Unified Sch. Dist.,*
   658 F.3d 954 (9th Cir. 2011) .....................................................................15

23

24

*Lorenzo v. SEC,*
   587 U.S. 71 (2019) .....................................................................................16

25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ...................................................................................15

26

27

*Rubin v. United States,*
   449 U.S. 424 (1981) ...................................................................................24

28

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................21

*Scott v. Harris*,
   550 U.S. 372 (2007) ........................................................................15

*SEC v. Beck*,
   No. 2:22-CV-00812 (FWS), 2024 WL 1626280 (C.D. Cal. Mar. 26, 2024) .........................23

*SEC v. Fehn*,
   97 F.3d 1276 (9th Cir. 1996) ...........................................................29

*SEC v. George*,
   426 F.3d 786 (6th Cir. 2005) ......................................................24, 25

*SEC v. Graham*,
   No. 2:09-CV-250 (JCM), 2011 WL 18328783 (D. Nev. May 13, 2011) ...............16

*SEC v. Great Lakes Equities Co.*,
   No. 89-CV-70601 (DT), 1990 WL 260587 (E.D. Mich. Sept. 4, 1990) ...............24

*SEC v. Hasho*,
   784 F. Supp. 1059 (S.D.N.Y. 1992) ...................................................17

*SEC v. Inteligentry, Ltd.*,
   No. 2:13-CV-00344 (RFB), 2015 WL 1470498 (D. Nev. Mar. 31, 2015) ............15

*SEC v. Kramer*,
   778 F. Supp. 2d 1320 (M.D. Fla. 2011) ..............................................23

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) .....................................................20, 21

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ...........................................................24

*SEC v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013) .................................................23

*SEC v. Sullivan*,
   68 F. Supp. 3d 1367 (D. Colo. 2014) .................................................16

*SEC v. Zandford*,
   535 U.S. 813 (2002) ............................................................ *passim*

*SEC v. Zouvas*,
   No. 3:16-CV-0998 (CAB), 2016 WL 6834028 (S.D. Cal. Nov. 21, 2016) ............16

*Sec. Inv. Prot. Corp. v. Vigman*,
   803 F.2d 1513 (9th Cir. 1986) ........................................................17

*Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*
    552 U.S. 148 (2008) ........................................................................16

*Taussig v. Hart*,
    58 N.Y. 425 (1874) .........................................................................17

*United States v. Dunn*,
    268 U.S. 121 (1925) ........................................................................18

*United States v. Naftalin*,
    441 U.S. 768, 773 (1979) ................................................................24

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ........................................................................16

*United States v. Rowe*,
    56 F.2d 747 (2d Cir. 1932) .............................................................18

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ..........................................................20

**Statutes**

15 U.S.C. §§ 77b ...................................................................................3

15 U.S.C. § 77q ...................................................................................16

15 U.S.C. § 78c ................................................................................3, 24

15 U.S.C. § 78j ................................................................................1, 16

15 U.S.C § 78o .......................................................................23, 24, 28

**Regulations and Rules**

17 C.F.R. § 240.10b-5 ......................................................................1, 16

17 C.F.R. § 240.15c1-2 .........................................................................25

Fed. R. Civ. P. 56 ..........................................................................*passim*

Fed. R. Evid. 801 ..............................................................................3, 8

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") hereby moves for summary judgment on Claims One through Four of the Complaint (ECF No. 1), and submits the following statement of undisputed material facts and memorandum of law in support, against Defendants Alpine Securities Corporation ("Alpine"), a registered broker-dealer, its former Chief Executive Officer ("CEO") and Chief Compliance Officer ("CCO") Christopher Doubek ("Doubek"), and its Chief Operations Officer ("COO") Joseph Walsh ("Walsh"). For the reasons set forth below, the Motion should be granted.

## I.    **Introduction**

There is nothing to dispute about the radical and fraudulent series of events that transpired at Alpine in May and June 2019, when the firm and two of its senior executives employed lies, deception, and fraud to make unauthorized sales and transfers of customers' securities all in service of Alpine's own business interests. On May 30, 2019, Alpine's CEO, CCO, and sole board member Doubek and COO Walsh sold 294 securities positions belonging to 265 customers to Alpine itself for *one penny* per position based on the false premise that those securities, some of which traded on the NYSE or NASDAQ, were "worthless." These trades occurred without notice to or permission from customers and resulted in Alpine acquiring stock valued at $267,000 for a meagre $2.94. These forced sales of purportedly "worthless" securities violated, as alleged in Claim One, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c); and, as alleged in Claim Two, Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"). Further, by selling its customers' securities to itself for (effectively) nothing, Alpine violated, as alleged in Claim Three, Section 15(c)(1)(A) of the Exchange Act, which proscribes fraudulent brokerage practices, and Doubek and Walsh aided and abetted that violation, which is Claim Four.

Defendants' fraudulent and deceptive conduct went beyond the 265 customers whose securities were taken from them. It continued into June 2019 when Defendants made 645 unauthorized transfers of stocks from customer accounts to Alpine's proprietary accounts on another false premise that those securities had been "abandoned." Those securities were valued on Alpine's books at approximately $54 million. These unauthorized transfers were also made without

1  prior notification to or permission from customers and prioritized Alpine's financial interests over

2  its customers' interests and instructions. As set forth below, the false attribution of millions of

3  dollars of property as "abandoned" and unauthorized transfers of such securities to Alpine are

4  another basis on which the Court should find Alpine, Doubek, and Walsh liable under Claims Three

5  and Four.

6      Because there can be no genuine disputes of material fact, and the record clearly establishes

7  Defendants' liability, the Court should grant summary judgment to the SEC.

8  **II.    Procedural History**

9      The SEC filed the Complaint in this matter on August 10, 2022 (ECF No. 1). On October

10  18, 2022, Defendants Alpine and Walsh moved to dismiss based on improper venue or to stay this

11  matter in light of another proceeding (ECF No. 14). On October 19, 2022, Defendant Doubek, who

12  is proceeding *pro se*, separately moved to dismiss on the ground that other parties should be joined

13  or to join those parties (ECF No. 17). The Court heard Defendants' motions on August 15, 2023,

14  and, for the reasons stated at the hearing, denied them (ECF No. 37). On September 15, 2023, the

15  Court entered a Stipulated Discovery Plan and Scheduling Order ("Scheduling Order") (ECF No.

16  41). Defendants filed answers on October 16 and 20, 2023, (ECF Nos. 48, 50). The Scheduling

17  Order was amended several times on the parties' motions, and discovery concluded on August 27,

18  2024 (ECF Nos. 63, 66, 73, 76).

19  **III.    Statement of Undisputed Material Facts**

20      Plaintiff submits the following statement of undisputed material facts for the relevant period

21  of December 2018 through June 2019, unless a different time is indicated.

22      **A.    Relevant Background**

23      1.    Alpine was at all relevant times a self-clearing broker-dealer registered with the SEC

24  and based in Salt Lake City, Utah. AA ¶ 10[1]; DA ¶ 10.

25

26  [1]  In accordance with Fed. R. Civ. P. 56(c)(1) and LR IA 7-3, the facts recited herein are supported
by record citations, deposition transcript excerpts, or exhibits that are appended to the Declaration

27  of Jacqueline Moessner dated October 10, 2024. As used herein, the abbreviated references to items
filed on the docket are: "**Compl.**": Complaint, ECF No. 1; "**AA**": Alpine and Walsh Answer, ECF

28

2.      Alpine was owned by SCA Clearing LLC ("SCA"). Ex. 1. ¶ 4 (Joint Stipulations of FINRA Proceeding[2] ("JS")). The interests in SCA were held by a series of trusts benefiting John Hurry ("Hurry") and his family members. *Id.*

3.      Alpine's business primarily involved clearing microcap stocks for its own retail customers and for other brokers. Ex. 1: JS ¶ 2; Ex 2: 30(b)(6) Dep 19:20-20:11, 21:6-8; Ex. 3: Hurry Dep. at 28:5-29:11.

4.      Microcap or "penny" stocks are low-priced shares of small companies that generally trade over-the-counter ("OTC"). Ex. 4 at 21. Such stocks are each a "security" under relevant provisions of the federal securities laws. *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).

5.      Alpine's retail customers had non-discretionary[3] brokerage accounts, and Alpine did "not permit discretionary trading in any form." Ex. 5 at 256; Ex. 2: 30(b)(6) Dep. 68:14-19.

6.      Doubek joined Alpine as its sole board member in December 2018 and became CEO on April 7, 2019, and CCO on May 10, 2019. AA ¶ 11; DA ¶ 11; Ex. 1: JS ¶ 10; Ex. 6: Doubek Dep. 23:3-7. When he was hired, Doubek lacked required securities licenses to be a "principal" of Alpine, and thus he did not assume the formal title of CEO until he re-acquired those licenses. DA ¶ 11; Ex. 6: Doubek 33:22-33:12, 38:7-23; Ex. 2: 30(b)(6) Dep. 33:2-18, 44:24-45:20.

7.      Walsh became Alpine's COO in September 2018 and remains in that role. AA ¶ 12; DA ¶ 12; Ex. 7: Walsh Dep. 22:18-25, 23:8-9. Walsh served as Alpine's interim CEO from December 2018 until April 7, 2019. AA ¶ 12; DA ¶ 12; Ex. 7: Walsh Dep. 22:18-23:12.

---

No. 48; and "**DA**": Doubek Answer, ECF No. 50. The abbreviated deposition references are: "**30(b)(6) Dep.**": Deposition of 30(b)(6) Representative for Alpine Securities Corporation (Ex. 2); "**Cruz Dep.**": Deposition of Darrel Michael Cruz (Ex. 19); "**Doubek Dep.**": Deposition of Christopher Doubek (Ex.6); "**Hurry Dep.**": Deposition of John Hurry (Ex. 3); "**Walsh Dep.**": Deposition of Joe Walsh (Ex. 7). Exhibits are referenced as "**Ex.**" and, to the extent the exhibit was used at a deposition or in another proceeding, may include other exhibit stickers.

[2]  The Joint Stipulations signed by Alpine through its counsel in another litigation, are admissible here as statements of a party opponent under Fed. R. Evid. 801(d)(2).

[3]  In non-discretionary accounts, the customer controls the account activities and places trades by directing a broker, whereas a broker of a discretionary account places the trades on its own initiative under a duty to manage the account in accordance with the customer's interests, financial situation, and preferences. *See* Ex. 8: Lefkowitz Rep. at 9-12, ¶ 34 and n.37-38.

8.      Both Doubek and Walsh had substantial experience in the securities industry. Doubek had approximately 25 years of experience, including as a CEO of a trading firm that had 130 employees, Ex. 6: Doubek Dep. 12:10-23:9; DA at 2 ("My background prior to joining this completely abusive and possibly criminal organization was in the securities clearance, execution software, professional trading arena. . . ."). Walsh had worked at multiple firms in the industry, generally in operations, since 1981. Ex. 7: Walsh Dep. 10:22-13:22.

9.      Doubek and Walsh were registered representatives of Alpine and also supervisory personnel or "principals." Ex. 6: Doubek Dep. 38:7-13; Ex. 7: Walsh Dep. 13:4-18, 26:2-9; Ex. 8: Lefkowitz Rep. at 8-9, ¶¶ 26, 29. Doubek and Walsh had to qualify for their roles by passing examinations (in addition to those required to work for a BD) concerning the applicable regulatory rules and standards. Ex. 8: Lefkowitz Rep. at 9, ¶ 29; Ex. 6: Doubek Dep. 38: 7-13; Ex. 7: Walsh Dep. 13:11-22.

10.     Alpine employees used email addresses with the domain "@alpine-securities.com." Ex. 2: 30(b)(6) Dep. 40:23-41:8. As of March 2019, Alpine also directed its customers to submit their questions and requests to "houseaccounts@alpine-securities.com" (the "House Accounts Email"). Ex. 1: JS ¶ 54. The House Accounts Email was accessible to and used by multiple Alpine employees, including Doubek and Walsh. Ex 6: Doubek Dep. 113:8-116:8; Ex. 2: 30(b)(6) Dep. 159:19-161:8.

11.     At all relevant times, Alpine's email servers were located in Oregon. Ex. 2: 30(b)(6) Dep. 39:9-25.

12.     Alpine used a customer agreement ("Customer Agreement") for both individual and corporate retail brokerage customers. Ex. 40 at 7-16; Ex. 4 at 7-16; Ex. 1: JS ¶ 24.

13.     Alpine had a written supervisory procedures ("WSP") manual that set forth its operational policies for employees. Ex. 5; Ex. 2: 30(b)(6) Dep. 56:11-57:7. The WSP manual effective during the period relevant here was dated October 1, 2015. *Id.*

14.     Alpine reported losses for the second and third quarters of 2018. Ex. 1: JS ¶ 21.

15.     Around July 2018, Alpine began to take steps to discontinue its retail brokerage business and close those customers' accounts. AA ¶ 13; DA ¶ 13; Ex. 1: JS ¶ 25.

16.     In August 2018, Alpine increased its retail customers' account fee from $100 per year to $5,000 per *month* (*i.e.*, $60,000 yearly). *Compare* Ex. 39 (fee schedule dated 7/31/2018) *with* Ex. 10 (fee schedule dated 8/31/2018); AA ¶ 13; DA ¶ 13; Ex. 1: JS ¶¶ 26-27.

**B.      The Forced Sales of Supposedly Worthless Securities**

17.     Alpine made available on its website a "Worthless Securities" form (the "Worthless Securities Form") that an Alpine retail customer could submit to request that a position which had become non-marketable or worthless be sold to Alpine for $0.01, generally to obtain a tax benefit from capital loss. Ex. 11 at 3-4; Ex. 7: Walsh Dep. 38:9-39:20, 41:2-9; *see also* Ex. 41 at 1-3 (email noting the need for a Worthless Securities Form); Lefkowitz Rep. at 11, ¶ 34.1.3 & n.32 (referencing FINRA 2011 Worthless Securities Reminders (*i.e.*, Ex. 42 at 4-5)).

18.     For customers who submitted the Worthless Securities Form, Alpine processed the trade requested by the customer for $0.01 per position. Ex. 7: Walsh Dep. 39:21-40:16; Ex. 11 at 3.

19.     Alpine's WSPs indicated that "[s]ales of 'worthless' securities as an accommodation to customers are reportable. (Sometimes these positions are not sold on a per-share basis but may be sold for one penny or one dollar ['penny for the lot' transaction].)." Ex. 5 at 384 (§ 14.14.2.1).

20.     Alpine maintained a proprietary account in the name "Alpine Securities Worthless Securities" (the "Worthless Securities Account") into which Alpine sold and held securities processed as "worthless" from customer accounts. Ex. 12 at 2; Ex. 1: JS ¶ 63; Ex. 7: Walsh Dep. 157:9-159:5.

21.     When Alpine sold a securities position from a customer's account to the Worthless Securities Account, it reported the transaction to FINRA and the market and generated a trade confirmation for the customer. Ex. 7: Walsh Dep. 47:13-17, 82:24-83:2, 83:7-12.

22.     Alpine owned the securities in the Worthless Securities Account. Ex. 7: Walsh Dep. 47:13-17.

23.     Beginning in December 2018, Alpine's senior management, including Doubek and Walsh, discussed using a "negative consent" process to sell customer's securities positions that had a value of $400 or less. Ex. 7: Walsh Dep. 83:19-86:9-17; 92:23-95:10; Ex. 13 at 1-3; Ex. 42 at 1.

24.     The "negative consent" process involved attempting to notify a customer about the

firm's planned action (here, to sell securities) and then, absent objection from the customer, the firm undertaking the described action. Ex. 13 at 2, 5; Ex. 7: Walsh Dep. 95:4-10, 247:24-248:5; Ex. 6: Doubek Dep. 60:5-20, 73:21-25. Thus, the negative consent process did not involve receiving affirmative consent or a trade request from a customer, but rather was based on a lack of objection to Alpine's proposed course of action. Ex. 13 at 5 ("To implement this assignment, no action is needed on your part. By not responding to this notification, you hereby acknowledge and agree you assign all shares of the above referenced security to Alpine Securities' worthless securities account for a sale price of one penny."); *see also* Ex. 42 at 3.

25.    Walsh suggested using a "negative consent" process because a prior firm at which he worked had used that process for a different purpose. Ex. 7: Walsh Dep. 93:5-7; 94:1-20, 247:5-23; Ex. 6: Doubek Dep. 73:16-20.

26.    Walsh suggested using a $400 threshold for deeming a position "worthless." Ex. 13 at 2-3; Ex. 7: Walsh Dep. 56:14-17; Ex. 14: Doubek Apr. 29, 2024 Interog. Resp. ¶ 3. This definition of "worthless" meant that the value of a position was less than the costs Alpine imposed to maintain or liquidate that position. Ex. 13, at *3; Ex. 6: Doubek Dep. 55:10-23. Walsh selected $400 as "kind of the opening attempt to close some of these old inactive, abandoned, orphaned house accounts." Ex. 7: Walsh Dep. 84:23-86:8, 86:9-17; 86:22-87:7. The amount represented the "the minimum fee that would potentially have been assessed to liquidate that – those shares in the open market, assuming, again, that there was a market for those shares." Ex. 6: Doubek Dep. 68:19-24; Ex. 13, at *3 ("Since our Pre-trade approval fee is $ 150.00 . . .").

27.    In January 2019, Walsh, along with attorney D. Michael Cruz[4] and then-CCO Jason Kane, prepared a draft "Negative Response Letter" (*i.e.,* Ex. 13 at 5) to be sent to customers using an exemplar Walsh obtained from his prior firm. Ex. 7: Walsh Dep. 93:4-13.

28.    On or near March 15, 2019, Alpine sent copies of the Negative Response Letter to customers with positions valued at $400 or less. Ex. 15 (sample letter to a customer); AA ¶ 15; Ex.

---

[4] D. Michael Cruz ("Cruz") was an attorney employed by the holding company of Alpine and an affiliated company Scottsdale Capital Advisors to provide legal services to Scottsdale and Alpine. Ex. 19: Cruz Dep. 7:16-22, 23:1-24:8, 26:14-27:10.

7: Walsh Dep. 42:8-14. The letter read, in part, "The security listed above has been deemed 'worthless' by Alpine securities," and "[a]ll your shares of the security listed above will be sold to our 'worthless securities account' for $0.01 proceeds. . . ." Ex. 15.

29.     Doubek approved the Negative Response Letter before it was sent to customers. Ex. 6: Doubek Dep. 72:18-20; AA ¶ 15.

30.     Alpine sent full-page notices as part of its February, March, and April 2019 account statements with the caption: "IMMEDIATE ACTION REQUIRED." Exs. 16 ("Feb. 28, 2019 Notice"), 17 ("March 31, 2019 Notice"), and 18 ("April 30, 2019 Notice"); Ex. 1: JS ¶¶ 37-39. These notices included the following advisement for positions worth under $400 (with minor alterations):

> **Positions Worth Less than $400**: Please submit a Worthless Securities Form found on our website to the email above and request account closure once the worthless security is processed. For positions worth less than $400 or have no active trading market, liquidation may incur greater fees and commissions than the position value.

Exs. 16, 17, 18; AA ¶ 16. These notices were a "collaborative effort" of at least Doubek, Walsh, Kane, and Cruz. Ex. 7: Walsh Dep. 98:23-99:3; Ex. 6: Doubek Dep. 70:22-23. Doubek approved sending them. Ex. 6: Doubek Dep. 63:8-17, 69:24-71:8, 80:11-81:4.

31.     The April 30, 2019 Notice (Ex. 18) stated, in part: "Alpine Securities will no longer accept any orders to liquidate stocks." This statement was false at the time that notice was sent; Alpine was accepting and would continue to accept orders to sell or liquidate stocks as of April 30, 2019. Ex. 7: Walsh Dep. 126:23-127:8; Ex. 3: Hurry Dep. 152:2-12. The language was included as a way to force customers to close accounts. Ex. 7: Walsh Dep. 127:13-23.

32.     On May 28 and 29, 2019, Walsh, assisted by a member of the operations staff, sold customer positions valued at less than $400 to Alpine's Worthless Securities Account. Ex. 7: Walsh Dep. 134:13-135:14, 137:1-9; Ex. 1: JS ¶¶ 62-64.

33.     After completing the trades of positions worth under $400 on May 29, 2019, Doubek told Walsh he "wanted to bump the threshold up between [$]400 and [$]1,500." Ex. 7, Walsh Dep. 141:2-7; Ex 43: Walsh Interrog. Resp. ¶ 1. Walsh told Doubek, "I'm going to need that in writing." Ex. 7: Walsh Dep. 141:2-7.

34.     Walsh did not question the instruction from Doubek to raise the threshold to $1,500, Ex. 20: Walsh On-the-Record Testimony ("OTR") 191:10-20,[5] but did express concerns to Doubek that Alpine had not provided prior notice to customers, Ex. 7: Walsh Dep. 142:7-18.

35.     On May 30, 2019, Doubek emailed Walsh: "Joe, per our discussion regarding the continuation of worthless trades from our existing accounts, please extend the process you employed with a threshold of $400 to now including [sic] include $1,500 position value as this would be the cost to process a physical certificate." Ex. 21; Ex. 7: Walsh Dep. 152:22-154:6.

36.     Doubek, in his capacity as CEO, made the decision to deem all positions worth $1500 or less as "worthless" and instructed Walsh, as COO, to sell all positions worth less than $1500 to Alpine. AA ¶ 23; Ex. 6: Doubek Dep. 106:4-107:2; Ex. 14: Doubek Interog. Resp. ¶ 4; Ex. 7: Walsh Dep. 141:2-144:3; Ex 43: Walsh Interrog. Resp. ¶ 1.

37.     The $1,500 figure was based on a then-recently increased fee Alpine charged to make a type of stock withdrawal, which went from $1,000 to approximately $1,500. Ex. 6: Doubek Dep. 85:7-17, 86:10-18; Ex. 1: JS ¶¶ 51-52.

38.     The $1,500 figure was chosen to expedite closing customer accounts, which could not occur if cash or securities remained in a customer account. Ex. 6: Doubek Dep. 85:20-86:9, 96:8-12; Ex. 7: Walsh Dep. 171:13-19.

39.     On May 30, 2019, Walsh conducted computer searches at Alpine to identify positions valued by Alpine's systems at $1,500 or less. Ex.7: Walsh Dep. 17:1-7, 149:9-150:18.

40.     On May 30, 2019, Walsh, assisted by a member of the operations staff, sold all customers' positions that Alpine's system valued between $400 and $1,500 to the Worthless Securities Account for $0.01 each (the "Forced Sales"). AA ¶ 24; Ex. 22 at 34-38; Ex. 7: Walsh Dep. 147:1-7.

41.     Walsh did not consult any compliance manuals or documents before executing the Forced Sales. Ex.7: Walsh Dep. 150:19-22.

---

[5]  This under oath testimony by Mr. Walsh in a different proceeding is admissible as a statement of a party opponent under Fed. R. Evid. 801(d)(2).

42.     The Forced Sales consisted of 294 positions held by approximately 265 customers. Ex. 2: 30(b)(6) Dep. 68:20-72:5; Ex. 23. The Forced Sales at issue here do not include the positions worth under $400 that Walsh traded on May 28 and 29, 2019. *See supra* ¶ 32.

43.     Each of the Forced Sales was made from a non-discretionary customer account. Ex. 2: 30(b)(6) Dep. 68:14-19.

44.     Alpine did not have customer authorization for any of the Forced Sales and had not provided customers with any notice that it would sell those securities as "worthless." AA ¶ 21; DA ¶¶ 17, 21; Ex. 24: Alpine RFA Resp. ¶ 1.

45.     Alpine did not conduct any analysis to determine if there was a willing buyer in the market for any of the Forced Sales. Ex. 2: 30(b)(6) Dep. 86:9-17; Ex. 6: Doubek Dep. 105:7-15.

46.     The combined approximate statement value of the Forced Sales (that is positions over $400) was $267,956. Ex. 2: 30(b)(6) Dep. 72:13-73:23, 78:5-79:15; Ex. 25 at 1.

47.     Doubek has stated that conducting the Forced Sales knowing that customers had not been notified was not reckless but "deliberate under the direct order of Hurry" and another person. DA ¶ 25.

48.     The Forced Sales were not trades solicited or authorized by customers and were, therefore, trades "recommended" by a broker, which made them subject to customer suitability requirements. Ex. 8: Lefkowitz Rep. at 38, ¶ 104. This required Alpine to understand a customer's individual interests with respect to their positions and terms under which the positions could be sold. *Id.* at 38, ¶ 104.1.

49.     As part of the Forced Sales, Alpine sold 17 customer positions for securities traded on exchanges like NYSE or NASDAQ. Ex. 8: Lefkowitz Rep. at 31-32, ¶¶ 80, 80.1-80.3 & Ex. 10.

50.     Alpine treated 66 different securities as "worthless" for purposes of the Forced Sales even though other customers at Alpine (approximately 147 accounts) held larger quantities of the same 66 positions but were not subject to the Forced Sales. Ex. 8: Lefkowitz Report. at 41 ¶ 106.2 & Ex. 11.

51.     Alpine sent trade confirmations for the Forced Sales to affected customers. Ex. 26 (compilation of trade confirmations); Ex. 2: 30(b)(6) Dep. 60:20-62:5. At least 9 of those customers

had addresses in Nevada. Ex. 26 at 34, 35, 78, 139, 140, 151, 177, 192, 256.

52.     Alpine received customer complaints about the Forced Sales by at least May 31, 2019. Ex. 27 at 3. In responding to a complaint, the House Accounts Email informed a customer: "All positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value. Please refer to the customer notification letter attached to April statements." *Id.* at 2. However, the April 30, 2019 Notice had no information regarding securities with a market value between $400 and $1500 being declared worthless by Alpine. Ex.7: Walsh Dep. 174:18-175:22; *see also* Ex. 18 (April 30, 2019 Notice).

53.     In early June 2019, Doubek and Walsh were involved in preparing another full-page notice to include with the May 2019 account statements that stated, among other things, "all positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value." Ex. 28; Ex. 29; Ex. 7: Walsh Dep. 131:22-132:20; Ex. 6: Doubek Dep. 84:12-25.

54.     Although the notice was dated May 31, 2019, metadata for the "Final" version of notice shows it was last modified by Walsh on June 7, 2019 (the "June 2019 Notice). *See* Ex. 30.

55.     On June 7, 2019, Walsh sent an email to Alpine employees, attaching the "Final" version of the June 2019 Notice, and wrote: "If any customer asks about his positions being removed as worthless , Send [sic] them this letter. This was included with all May Customer Statements." Ex. 29.

56.     The statement in the June 2019 Notice (Ex. 28) that the costs to transfer these securities exceeded their value was false; 17 positions declared worthless on May 30, 2019 were securities that publicly traded on exchanges and which could have been transferred for $100 through an automated system called "ACAT" to another broker. Ex.8: Lefkowitz Rep. at 31-32 ¶¶ 80, 80.4; Ex. 7: Walsh Dep. 19:20-20:3; Ex. 6: Doubek Dep. 101:1-8. These included positions in MetLife, Ford Motor, and Broadcom, whose value on the day of the transfers exceeded $0.01. Ex, 8: Lefkowitz Rep. at 31-32 ¶¶ 80-80.4; Ex. 25 (summary of worthless securities transactions), lines 73, 114, 166.

57.     On or after June 7, 2019, Alpine sent the June 2019 Notice to at least some

customers, including by email. Ex. 7: Walsh Dep. 133:10-22; Ex. 31 at 1 (email dated June 13, 2019); Ex. 2: 30(b)(6) Dep. 58:8-16; Ex. 8: Lefkowitz Rep. at 33 ¶ 83.

58.     Doubek approved sending the June 2019 Notice to customers. Ex. 6: Doubek Dep. 84:12-20; Ex. 2: 30(b)(6) Dep. 59:19-21.

59.     Walsh began reversing the Forced Sales in bulk after FINRA interviewed him under oath in July 2019. Ex. 7: Walsh Dep. 166:6-24. Discrete transactions were also reversed on an individual basis on at least May 31, June 11, and June 12, 2019. Ex. 7: Walsh Dep. 167:12-15; Ex. 23 (entries 44, 2288, 3360).

60.     In conducting the Forced Sales, Alpine, Doubek, and Walsh violated one or more of the following regulatory duties, compliance considerations, customs or practices of broker-dealers, Ex. 8, Lefkowitz Rep. at 2 ¶ 2, for either some or all transactions: (1) customer suitability requirements, *id.* at 38, ¶ 104; (2) best-execution, *id.* at 40, ¶ 105; (3) making material misrepresentations and omissions, *id.*at 40-42 ¶¶ 106-109, (4) using deceptive conduct, *id.* at 43, ¶¶ 110-111.1.1; (5) transaction confirmation violations, *id.* at 45, ¶¶ 121-122; and (6) failing to consider more compliant alternatives to close accounts, *id.* at 46-49, ¶¶ 123-30.

## C.     The "Abandoned" Securities Transfers

61.     In early 2019, Walsh opened holding accounts at Alpine for each of the 50 states to segregate and track customer property for purposes of eventually transferring customers' unclaimed property to those states. Ex. 7: Walsh Dep. 183:13-184:16; Ex. 2: 30(b)(6) Dep. 88:7-18. These unclaimed property accounts each had an internal Alpine account number that began with "1122" (the "1122 Accounts"). Ex. 7: Walsh Dep. 183:19-21; Ex. 33 at 2 (sample 1122 Account statement).

62.     The 1122 Accounts were set up to satisfy state-law obligations to handle unclaimed property (potentially for escheatment to the state) when an account was dormant or a customer died. Ex. 2: 30(b)(6) Dep. 96:18-97:18.

63.     While it was an internal Alpine holding account, the listed account holder for at least some 1122 Accounts was the name of a state or official; for example, the account for unclaimed property related to customers in Missouri was in the name of: "State of Missouri, Missouri State Treasurer Eric Schmitt." Ex. 33 at 2; Ex. 2: 30(b)(6) Dep. 90:21-92:13.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

64.     Walsh believed that closing Alpine's retail accounts was "the big project, the big picture," Ex. 7: Walsh Dep. 110:8-12, and handling worthless securities was the "first wave." Ex. 7: Walsh Dep. 179:12-180:10.

65.     After the worthless securities sales "project was completed," Doubek told Walsh he had received instructions to close all remaining Alpine accounts by the end of June 2019. Ex. 7: Walsh Dep. 176:18-177:11. Walsh believed that Doubek received such instructions from Hurry. Ex. 7: Walsh Dep. 177:23-178:8.

66.     Doubek and Walsh "discussed what possible options" they had to close remaining accounts and, based on previously notifying customers that Alpine was "getting out of the direct retail business," they discussed "the fact that these accounts were inactive, orphaned, abandoned" because customers had not responded to Alpine's notices. Ex. 7: Walsh Dep. 176:18-177:11.

67.     Walsh suggested they "escheat[6] these accounts to their home states" where they would "be held in their state unclaimed property account" and a customer could claim the property. Ex. 7: Walsh Dep. 179:2-181:9. Walsh told Doubek about a conversation Walsh had earlier in 2019 with a Utah-state securities regulator who had advised Walsh to consider the portion of the Customer Agreement covering inactive and abandoned accounts as a way that Alpine could close accounts. Ex. 7: Walsh Dep. 178:9-179:1, 181:10-22. The regulator had also advised that the state would not allow Alpine to liquidate customer positions to cover the $5,000 monthly account fee. *Id.* 181:13-22.

68.     Alpine's Customer Agreement addressed "Inactive and Abandoned Accounts" and provided if Alpine was unable to contact an account holder within three years, the account "will be presumed to be abandoned," and the "[f]unds in abandoned account will be remitted in accordance with state law." Ex. 40 at 13 ¶ 32; Ex. 4 at 13 ¶ 32.

69.     Alpine had policies in its WSPs with respect to attempting to finding lost security holders. Ex. 5 at 155 (WSPs § 8.20). The policies required, among other things, Alpine to (1) make

---

[6] The June 2019 Notice also used the term "escheatment," which refers to the process by which assets that are unclaimed or abandoned are remitted to a state for custody, and after a period of time, can become property of a state. *See* Ex. 8: Lefkowitz Rep. at 16-17, ¶¶ 48-51.

two attempts to contact customers who are natural persons and then (2) conduct two searches using information databases, which had to be 6-12 months apart. *Id.*

70.     Alpine referred to a plan to move all remaining positions and to deem them "abandoned" in the June 2019 Notice (*see supra* ¶¶ 54, 55, 57):

> **Effective June 1, 2019 Alpine Securities will take action to close all remaining accounts. This means no further statements will be generated for your account.**
>
> **Alpine will liquidate enough positions in your account that have an active market to cover any open debits. All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state.**

Ex. 29 at 2 (June 2019 Notice) (emphasis in original).

71.     Between June 7 and 24, 2019, Walsh transferred all remaining customer securities' positions to the 1122 Accounts (the "Abandoned Securities Transfers") for the state corresponding with the customer's address. Ex. 1: JS ¶ 68; Ex. 7: Walsh Dep. 185:1-186:5.

72.     The Abandoned Securities Transfers consisted of 645 positions held by approximately 545 retail customers. Ex. 2, 30(b)(6) Dep. 98:12-100:20; Ex. 34 (listing all positions transferred). At least 35 of those transfers were for customers who had addresses in Nevada. Ex. 34: lines 41, 71, 121, 198, 199, 333, 403, 404, 436, 525, 546, 547, 549, 555, 596, 597, 609, 619, 637, 759, 789, 807, 831, 885, 903, 939, 1013, 1021, 1093, 1095, 1099, 1137, 1183, 1195, 1211 (showing abandoned property positions transferred to the Nevada Unclaimed Property Account).

73.     The combined statement value for all Abandoned Securities Transfers was approximately $54,591,302. Ex. 2: 30(b)(6) Dep. 102:10-103:5; Ex. 35 at 1.

74.     Alpine did not remunerate any customer or generate trade confirmations for any of the Abandoned Securities Transfers. Ex. 2: 30(b)(6) Dep. 93:9-14.

75.     The Abandoned Securities Transfers removed a security position from the customer's brokerage account and placed the position in an account not in the customer's name nor under their control. Ex. 6: Doubek Dep. 109:13-112:3; DA ¶ 33.

76.     Doubek helped customers who complained about the transfers restore their position to the customer's account if the customer agreed to take possession of the securities or to sell them.

13

Ex. 6: Doubek Dep. 110:20-111:3.

77.     No Alpine employees, including Doubek and Walsh, analyzed if the positions moved to 1122 accounts qualified as "inactive" or "abandoned" under the Customer Agreement. Ex. 2: 30(b)(6) Dep. 109:15-110:5; Ex. 7: Walsh Dep. 178:24-179:1, 182:19-183:12; DA ¶ 36.

78.     Alpine is not aware of any evidence that the positions transferred were actually "inactive" or "abandoned" under the terms of the Customer Agreement. Ex. 2: 30(b)(6) Dep. 110:8-112:4.

79.     As part of the process to close remaining accounts, Walsh renamed an existing Alpine proprietary account to be called the "Liquidate to Cover Debit" account. Ex. 7: Walsh Dep. 198:24-199:23. The account was established to transfer "potentially real marketable securities" to this account to pay outstanding customer debits before transferring any remaining securities to the state escheatment accounts. Ex. 1: JS ¶ 41; Ex. 7: Walsh Dep. 198:24-199:23. This was based on instructions from Doubek that he did not want to escheat marketable securities. Ex. 7: Walsh Dep. 200:3-18.

80.     On June 25, 2019, Walsh and Doubek set up an auto-reply message for the House Accounts Email that stated, among other things, "All assets in your accounts have been submitted for processing to your state of residence for Unclaimed Property/Escheatment. Please contact your state for instructions on how to reclaim your assets." Ex. 7: Walsh Dep. 191:3-192:16; Exs. 36, 37.

81.     Walsh put up that auto-reply message because Alpine "was getting slammed" from customers complaining about Alpine's actions. Ex. 7: Walsh Dep. 191:13-21.

82.     On June 25, 2019, Cruz emailed Doubek and forwarded the "Automatic Reply – House Accounts" email, writing: "Are you saying that all the remaining accounts at Alpine have been abandoned and have become subject to the escheatment process? Depending on the state, it takes 3-5 years to deem an account abandoned." Ex. 38.

83.     On June 27 and 28, 2019, Walsh reversed the Abandoned Securities Transfers and returned the customers' positions to their accounts. Ex. 34 (listing reversals). Alpine reversed all transfers to the Liquidate to Cover Debit account by August 30, 2019. Ex. 1: JS ¶ 41-42.

84.     In conducting the Abandoned Securities Transfers, Alpine, Doubek, and Walsh

1   violated one or more of the following regulatory duties, compliance considerations, customs or

2   practices of broker-dealers, Ex. 8: Lefkowitz Rep. at 2 ¶ 2: (1) making material misrepresentations,

3   *id.*. at 44-45, ¶¶ 115-118; and (2) failing to consider more compliant alternatives to close accounts,

4   *id.* at 46-49, ¶¶ 123-30.

5   **IV.**    <u>**Summary Judgment Standard**</u>

6         Summary judgment is appropriate where "there is no genuine dispute as to any material fact

7   and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *Celotex Corp.*

8   *v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of persuasion, and

9   "[w]hen considering the propriety of summary judgment, the court views all facts and draws all

10   inferences in the light most favorable to the nonmoving party." *SEC v. Inteligentry, Ltd.*, No. 2:13-

11   CV-00344 (RFB), 2015 WL 1470498, at *4 (D. Nev. Mar. 31, 2015), aff'd, 749 F. App'x 661 (9th

12   Cir. 2019) (citing *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011)).

13   However, once the moving party has met its burden, the "nonmoving party must come forward with

14   'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith*

15   *Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[T]he non-moving party

16   'must do more than simply show that there is some metaphysical doubt as to the material facts. . . .

17   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

18   party, there is no 'genuine issue for trial.'" *Inteligentry*, 2015 WL 1470498, at *4 (quoting *Scott v.*

19   *Harris*, 550 U.S. 372, 380 (2007)).

20   **V.**    <u>**Argument**</u>

21        **A.**    **Claims One and Two – Defendants Violated Section 10(b) and Rules 10b-5(a) &**
22              **(c) of the Exchange Act and Section 17(a)(1) of the Securities Act.**

23         Based on the Forced Sales, the SEC has alleged that Defendants violated Section 10(b) of

24   the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder, and Section 17(a)(1) of the

25   Securities Act. Foremost, Doubek, Alpine's CEO, CCO, and sole board member at the time, does

26   not dispute that he violated Sections 10(b) and 17(a) with the Forced Sales conduct (although he

27   disputes the relief sought). DA ¶¶ 55-56, 58-59.

28

Section 10(b) prohibits the use, "in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance" in violation of rules promulgated by the Commission "in the public interest or for the protection of investors." 15 U.S.C. 78j(b). Rule 10b-5(a) and (c) in turn prohibit "any person" from "employ[ing] any device, scheme, or artifice to defraud," or "engag[ing] in any act [or] practice" that "operates or would operate as a fraud or deceit upon any person" "in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5. In short, Section 10(b) and Rule 10b-5 encompass "(1) using any deceptive device (2) in connection with the purchase or sale of securities. . . ." *United States v. O'Hagan*, 521 U.S. 642, 651 (1997). Similarly, Section 17(a)(1) of the Securities Act prohibits any person, in the offer or sale of any securities, from employing any device, scheme, or artifice to defraud. 15 U.S.C. § 77q(a).

These anti-fraud provisions of the securities laws "capture a wide range of conduct," *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019), and recognize that "conduct itself can be deceptive," and there is no requirement that "there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5." *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008). Liability for such schemes may involve conduct like "participat[ing] in an illegitimate, sham, or inherently deceptive transaction where [a defendant's] conduct or role has the purpose and effect of creating a false appearance," *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014) (citations and internal quotation marks omitted), as well as conduct that involves making and disseminating false statements, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (citing *Lorenzo*, 587 U.S. at 80). *See also SEC v. Zouvas*, No. 3:16-CV-0998 (CAB), 2016 WL 6834028, at *6 (S.D. Cal. Nov. 21, 2016) ("As alleged, Zouvas' conduct had the purpose and effect of creating false appearances of fact as to the true owners of Crown's securities, legitimized Larson's nominees as stock holders and deceived investors regarding Crown's revenue potential."). To prevail on these anti-fraud claims based on deceptive conduct (sometimes referred to as "scheme liability"), the SEC must prove four elements: (1) the use or employment of a device, scheme or artifice to defraud, or an act, practice or course of business that operates as a fraud; (2) scienter; (3) in connection with the purchase or sale of securities; and (4) the use of the means of

1
2

instrument of interstate commerce. *See id.* at *5 (citations omitted); *see also SEC v. Graham*, No. 2:09-CV-250 (JCM), 2011 WL 18328783, at *4 (D. Nev. May 13, 2011).

### 1.   Defendants Employed Deceptive Conduct to Falsely Deem and Sell Without Authorization Hundreds of Securities as "Worthless."

3
4
5
6
7
8
9
10
11
12
13
14
15

"[I]t is well-settled that claims under Rule 10b-5 arise when brokers purchase or sell securities on their clients' behalf without specific authorization. For example, a claim for unauthorized trading, which occurs when a broker intentionally places trades without obtaining the customer's approval, historically has been well-established under Rule 10b-5." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 323-324 (2d Cir. 2002) (citing, *inter alia, Sec. Inv. Prot. Corp. v. Vigman*, 803 F.2d 1513, 1519 (9th Cir. 1986) (holding that unauthorized transactions in customer's brokers accounts could state a claim under Section 10(b)) and *Cruse v. Equitable Sec. of NY, Inc.*, 678 F. Supp. 1023, 1028 (S.D.N.Y 1987) (rejecting argument that a claim for unauthorized trading must fail because there was no affirmative misrepresentation or deception because "[plaintiff] has alleged such material omission or nondisclosure by stating that the account was a non-discretionary one and that defendant [] traded securities for the account without first obtaining the requisite authority.")).

16
17
18
19
20
21
22
23
24
25
26
27
28

In the context of unauthorized securities sales, a fraud arises where the broker acts with the undisclosed purpose of benefitting itself (as opposed to the customer), and the broker's self-interest coincides with lack of customer authorization or disclosure. *See SEC v. Zandford*, 535 U.S. 813, 821 (2002); *see also SEC v. Hasho*, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992) ("Unauthorized trades are illegal when accompanied with 'deception, misrepresentation or non-disclosure' to be actionable under Rule 10b–5."). In *Zandford*, the Supreme Court addressed the Commission's allegations of deceptive conduct where a broker made sales of customer securities for the broker's own benefit, and the Court recognized that "each time [defendant] 'exercised his power of disposition for his own benefit,' that conduct 'without more' was a fraud." 535 U.S. at 820-21. Unauthorized trading by a broker has long been recognized as tantamount to fraudulent conversion or embezzlement. *See Taussig v. Hart*, 58 N.Y. 425, 430 (1874) ("To allow a broker to sell his customer's stock without authority, and speculate upon replacing it at a lower price, would be encouraging speculations by agents, at the risk of their principals, totally inadmissible under

17

familiar rules."). And such conduct is fraudulent irrespective of whether the broker ultimately misappropriates an unauthorized sale's proceeds. *See Zandford*, 535 U.S. at 822 ("The fact that respondent misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense."); *United States v. Dunn*, 268 U.S. 121, 131 (1925) (fiduciary's "exercise[] [of] his power of disposition for his own benefit without more" is fraud); *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (L. Hand, J.) ("A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.").

It cannot be disputed that the Forced Sales – sales of positions worth between $400 and $1500 – were *unauthorized* securities trades of 294 positions held in more than 250 customer accounts. SOF ¶¶ 36-46. It is also not disputable that for the Forced Sales, Alpine, Doubek and Walsh made no prior disclosure – written, oral, or otherwise – to any affected customer to advise them that Alpine would be selling *their* property to itself for a penny in return. SOF ¶ 44. Nor is having told holders of securities whose positions were worth *under* $400 (through negative consent or otherwise) (SOF ¶23-32) notice to customers affected by the Forced Sales whose positions are not disputed to have exceeded $400.

Walsh executed these unauthorized trades based on Doubek's instructions, SOF ¶¶ 33-36, and both were involved in preparing the notices falsely telling the customers that their property was "worthless." SOF ¶¶ 53-58. It is beyond dispute that their purpose in these actions was to prioritize Alpine's corporate interests in closing accounts over any customer interest in obtaining the maximum value and return on their holdings. SOF ¶¶ 15, 26, 31. Indeed, the interests of the customers clearly did not play any role in Defendants' decision to sell positions worth more than $400 to themselves for a penny, including Alpine's sale of 17 positions of securities traded on exchanges (including companies like MetLife, Ford Motor, and Broadcom), where any general market sale would have exceeded one penny in remuneration to the customer. SOF ¶ 56.

Moreover, the Forced Sales were furthered (if not entirely accomplished) by deceiving and withholding material information from customers. Walsh and Doubek's essential lie to customers was that the positions sold were "worthless." SOF ¶¶ 53-58. This false labeling of property as

valueless, when it is not disputed that each position individually had value and the combined lot of positions had substantial value (more than $267,000), was critical to depriving the customers of their rights to control and dispose of their property as they wished. If those securities Alpine, Doubek, and Walsh deemed "worthless" were truly so, then the position should have had the same value regardless of the number of shares held. However, Alpine treated 66 securities as "worthless" for these purposes even though *other* customers at Alpine (approximately 147 accounts) holding larger amounts of the same 66 securities were allowed to keep their positions (at least until Doubek and Walsh declared them abandoned) and did not have their positions sold on May 30, 2019. SOF ¶ 50. Of course, this disparate treatment was unsurprising since Doubek, Walsh, and Alpine had not conducted any analysis of the positions to see if there was a willing buyer in the market, much less to recognize that some of positions traded on national exchanges like NYSE and NASDAQ. SOF ¶¶ 45, 49, 56.

In addition, Alpine, Walsh, and Doubek made other misstatements and used further deception. In the April 30, 2019 Notice (drafted collaboratively by Walsh and Doubek and approved by Doubek), Defendants told customers that Alpine was no longer accepting requests to liquidate positions, which was false and done to attempt to force customers to close their accounts. SOF ¶ 31. Next, on the heels of making the Forced Sales on May 30, 2019, Defendants covered up the activity by gaslighting those customers who complained; for instance, on May 31, 2019, the House Accounts Email falsely communicated with one customer (copying Walsh) that the April 30, 2019 Notice had described that Forced Sales would take place, when it had not. SOF ¶ 52. Walsh and Doubek then prepared the June 2019 Notice that disseminated and built upon the lie that the positions were "worthless" in falsely stating "the cost to transfer these securities exceed[ed] the value." SOF ¶¶ 53-56. Yet, Defendants had done no analysis on which to base such a statement, and numerous positions were publicly traded or immediately saleable or transferrable to other brokers. SOF ¶¶ 45-46, 49, 56.

The fraudulent conduct further involved withholding critical information – namely that Alpine, Doubek and Walsh intended to sell customer's positions to achieve Alpine's business goals. Having arranged for several months to use a "negative consent" process to force the sale of

positions valued at less than $400, Defendants decision *not* to provide the same (or any) notice with respect to Forced Sales valued at $1,500 or less deprived Alpine's account holders of critical information about the sales Alpine was contemplating. The months-long process the Defendants engaged in for positions worth under $400 to obtain what they viewed as customer authorization or non-objection reveals that Defendants fully appreciated the obvious requirement that securities holders have the right to decide how their stocks will be bought and sold. Doubek's instruction to sell the shares valued between $400 and $1500 with no notice to customers, and Walsh's agreement to do so and implementation of the plan, bypassed the fundamental requirement to provide truthful information about the trades to the customer.

Thus, what transpired here aligns closely with what the Supreme Court addressed in *Zandford*, where the Court recognized that "each time [the broker] exercised his power of disposition for his own benefit, that conduct, without more, was a fraud." 535 U.S. at 821 (internal quotation marks omitted). In this case, Doubek and Walsh, acting for Alpine, bought 294 positions valued by Alpine at more than $267,000 for $2.94, with no notice or authorization because they put Alpine's interest in closing accounts ahead of their customers' interests. Indeed, while *Zandford* involved a discretionary trading account, Defendants' conduct here did not, and thus it is even more difficult to rationalize since the Defendants never had a basis to *sua sponte* place trades without customer authorization (regardless of the securities value). At its core, this was indisputably fraudulent conduct built on deceptive acts.

### 2. Defendants Acted with Scienter.

As with other claims under Section 10(b) and 17(a)(1), unauthorized trading becomes fraudulent when a defendant acts with scienter. *See Brophy v. Redivo*, 725 F.2d 1218, 1220 (9th Cir. 1984) (holding proof of § 10(b) claim for unauthorized trading requires scienter). "Scienter refers to a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)) (internal quotation marks omitted). The Court of Appeals has explained that scienter can be shown through "deliberate recklessness" or "conscious recklessness." *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093-94 (9th Cir. 2010) (quoting *Gebhart v. SEC*, 595 F.3d

1034, 1041-42 (9th Cir. 2010)); *accord Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018). "[D]eliberate recklessness" has been held to be "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)); *see also Platforms Wireless*, 617 F.3d at 1095–96 (affirming summary judgment and holding scienter established through deliberate recklessness).

### a. Doubek and Walsh Each Acted with the Intent to Deceive Customers and in Total Disregard of Their Obligations.

Doubek and Walsh each acted with scienter. Each knew that no notice had been provided to the customers impacted by the Forced Sales. SOF ¶¶ 34, 44. Each had been involved in Alpine's process of trying to close accounts using notices or negative consent for months. SOF ¶¶ 23-32. Each knew that there was no customer authorization in any of the correspondence or in the Negative Consent Letter to cover positions worth more than $400. SOF ¶¶ 34, 44. Each was a registered representative and aware of their obligations to customers; indeed, Doubek had just retaken licensing examinations in the months prior to authorizing the Forced Sales. SOF ¶¶ 6, 9. Despite being fully informed of all the relevant facts and their obligations, both Doubek and Walsh went ahead and raised the threshold to $1,500 to expedite closing customer accounts. SOF ¶¶ 15, 26, 31, 33-38. This bypassed the fundamental structure of the broker relationship (and Alpine's business) to take orders at the direction and approval of the customer, a particularly egregious decision given the substantial experience Doubek and Walsh each had in the securities industry. SOF ¶¶ 6-10.

Even absent the proof of their intent to deliberately mislead customers, neither Doubek nor Walsh can dispute that their conduct was at minimum highly reckless. *See, e.g.*, *Herman v. T. & S. Commodities, Inc.*, 578 F. Supp. 601, 604 (S.D.N.Y. 1983) ("Whatever Mr. Sherman's motives may have been, it is plain that he was more than reckless with respect to the unauthorized nature of the transactions he engaged in; he acted intentionally with full knowledge that he was violating the plaintiff's rights."). As noted above, each had significant experience in the securities industry and was a registered representative, but each failed to evaluate whether these trades were suitable for the

customer and failed to seek best execution for the customer. SOF ¶¶ 6-10, 45, 48. Each also knew that these trades were entered principally to meet Alpine's objective of closing accounts. SOF ¶¶ 15, 26, 31, 34, 44. Thus, each knew or was deliberately reckless to the fact that these trades essentially amounted to Alpine's theft or conversion of these securities. Therefore, to the extent there is any question about the intentionality of Doubek and Walsh's actions, it remains beyond dispute such a gross disregard of standards for registered representatives establishes scienter.

### b.    Doubek and Walsh's Scienter is Imputed to Alpine.

A "corporation 'can only act through its employees and agents' and likewise can only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (internal citation omitted). Here, Doubek was Alpine's CEO, CCO, and sole board member at the time of the Forced Sales; in short, he was Alpine's most senior officer and entire board. SOF ¶¶ 6-7. Walsh was Alpine's COO and a former acting CEO during part of the period leading up to the conduct at issue. SOF ¶ 7. The scienter of either of these senior executives alone is enough to establish Alpine's liability, and their work together to carry out the Forced Sales certainly satisfies the standard as well.

### 3.    The Conduct Was in Connection with a Securities Sale.

The undisputed facts also show that Defendants' scheme to defraud was "in connection with the purchase or sale of any security" for purposes of Section 10(b) and Rule 10b-5, and "in the offer or sale of any securities" for purposes of Section 17(a). This element "'should be construed flexibly, not technically and restrictively.'" *Zandford*, 535 U.S. at 821 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)). The undisputed facts show that the Forced Sales were each a sale of stock from customers' accounts to Alpine's proprietary Worthless Securities Account for one penny. SOF ¶ 42. Alpine generated trade confirmations for each sale and reported these trades to FINRA. SOF ¶ 51. Thus, the conduct clearly occurred as part of a sales process.

### 4.    Defendants Used Means of Interstate Commerce.

The undisputed facts also show that defendants used means of interstate commerce as part of the fraudulent scheme, including by sending emails from Salt Lake City to affected customers

22

outside of Utah, which transited servers in Oregon. SOF ¶ 11, 51. *SEC v. Beck*, No. 2:22-CV-00812 (FWS), 2024 WL 1626280, at *10 (C.D. Cal. Mar. 26, 2024) ("This element is satisfied, among other ways, 'by using websites, email, and Twitter to promote his stock selections and engage with investors.'") (collecting cases); *see also SEC v. Straub*, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce."). The emails included at least 9 customers with addresses in Nevada. SOF ¶ 51.

***

The Forced Sales were a deliberate effort by Alpine, Doubek, and Walsh to falsely justify the forced sale of 294 securities as "worthless," and the indisputable evidence having shown this, summary judgment to the SEC on Claims One and Two is warranted.

**B.    Claims Three and Four – Alpine Violated § 15(c)(1)(A) of the Exchange Act and Doubek and Walsh Aided and Abetted that Violation.**

Alpine is alleged in Claim Three to have violated Section 15(c)(1)(A) of the Exchange Act, and Doubek and Walsh are alleged aiders and abettors of that conduct in Claim Four. These claims are premised on *both* the Forced Sales and the Abandoned Securities Transfers. *See* Compl. ¶¶ 60, 62, 64, 66.

**1.    Alpine Violated § 15(c)(1)(A) of the Exchange Act.**

Section 15(c)(1)(A) of the Exchange Act prohibits a broker from "mak[ing] use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . by means of any manipulative, deceptive, or other fraudulent device or contrivance." 15 U.S.C. § 78o(c)(1)(A). While Section 10(b) proscribes fraudulent and deceptive conduct undertaken "in connection with the purchase or sale of any security," Section 15(c)(1) covers brokers "effecting any transaction"[7] or "induc[ing] or

---

[7] The Exchange Act does not define "effecting transactions," *see SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334–35 (M.D. Fla. 2011), but the term is used throughout Section 15 to address the regulation of brokers, including to define what business activities make someone a broker: one who is "engaged in the business of *effecting transactions* in securities for the account of others," 15 U.S.C. § 78c(a)(4)(A) (emphasis added); and in Section 15(a) where it is made unlawful for an unregistered broker to "*effect any transactions* in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o(a)(1) (emphasis added).

attempt[ing] to induce the purchase or sale of, any security," 15 U.S.C § 78o(c)(1)(A). Just as the "in connection with" language of Section 10(b) is broadly construed and satisfied when a "scheme to defraud and the sale of securities coincide," *Zandford*, 535 U.S. at 822, the "effect any transaction in, or to induce or attempt to induce the purchase or sale" language must be viewed as a "catch-all" provision intended to reach all "cunning devices" and fraudulent conduct on the part of a broker in the course of effecting customer transactions. *C.f. Hochfelder*, 425 U.S. at 202 (1976); *United States v. Naftalin*, 441 U.S. 768, 773 (1979) (the "in the offer or sale of any securities" language from Section 17(a) was "expansive enough to encompass the entire selling process" and "does not require that the fraud occur in any particular phase of the selling transaction"); *Rubin v. United States*, 449 U.S. 424, 429 (1981) (pledge of stock as collateral for loan constituted an offer or sale); *SEC v. Rana Rsch., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) ("in connection with" requirement satisfied where fraud "touches upon" or has "some nexus" with any securities transaction).

Courts have generally recognized, notwithstanding the textual distinctions, that the elements to prove a Section 15(c)(1) violation are the same as, or highly similar to, those for Sections 10(b) or 17(a). *See SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005); *SEC v. Great Lakes Equities Co.*, No. 89-CV-70601 (DT), 1990 WL 260587, at *5 (E.D. Mich. Sept. 4, 1990), aff'd, 12 F.3d 214 (6th Cir. 1993) ("The elements of a cause of action under 15c(1) [sic] are the same as for section 17(a), section 10(b), and Rule 10b–5 except that Rule 15c1–2 requires that a statement or omission be made only with knowledge or reasonable grounds to believe that it is untrue and misleading.").

Here, given the overlapping coverage of Section 15(c)(1) with other anti-fraud provisions of the securities laws, if the Court concludes that Alpine – indisputably a broker – violated either or both of Exchange Act § 10(b) or Securities Act § 17(a) in conducting the Forced Sales, as set forth above, such a finding would also establish liability under Section 15(c)(1)(A) as well. *See*, *e.g.*, *George*, 426 F.3d 786, 792–97 (affirming district court's grant of summary judgment on Section 15(c)(1)(a) claim).

*In addition*, the Court should *also* find Alpine liable under Claim Three based on the Abandoned Securities Transfers because those transfers were part of a fraudulent scheme to close

customer accounts in a way that substantially benefited Alpine and deprived its customers of control over their property under false pretenses.

> **a.    The Transfers of "Abandoned" Positions Involved Fraud, Deceit and Lies.**

Just as with the Forced Sales, the Abandoned Securities Transfers involved Alpine, a broker, converting customer property for its own benefit using deceptive conduct.[8] *See Zandford*, 535 U.S. at 821. Again, without notice or customer authorization, Alpine transferred customer property from retail accounts and then misleadingly represented that those positions had been sent outside of Alpine's control and to state authorities (who should be contacted instead). In so doing, Alpine was able to accomplish its business goal of closing accounts (which could not occur if positions remained in customer accounts) and prioritized its own interest over those of its customers by interfering with their ability to access and sell their property.

First, it cannot be disputed that the Abandoned Securities transfers were taken without any authorization by, or prior disclosure to, Alpine's customers, which was deception through non-disclosure. *See id.* at 820–21 ("each was deceptive because it was neither authorized by, nor disclosed to, the Woods"). Alpine neither honored the terms of its Customer Agreement that dictated how it would handle "Inactive" or "Abandoned" accounts, nor took steps to actually determine if any of the 645 positions (worth approximately $54 million on Alpine's books) had truly been abandoned by the customers. Nor is it disputed that Alpine began making the Abandoned Securities Transfers before notifying customers it was doing so; Walsh began the Abandoned Securities Transfers on June 7, 2019, the same day he was circulating within Alpine the June 2019 Notice that stated: "All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state." SOF ¶¶ 53-55, 57 (notices sent

---

[8] For purposes of Section 15(c)(1), the terms "manipulative, deceptive, or other fraudulent device" have been defined to mean either "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," or "any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading." 17 C.F.R. § 240.15c1-2(a)-(b).

25

June 13, 2019), 70. Thus, Alpine lacked any authorization for its unilateral decision to deem tens of millions of dollars in property deserted by its owners.

Second, Alpine made false and misleading statements as part of carrying out the transfers. The most obvious, and not plausibly disputable, false statement was labeling 645 positions as "abandoned" in the June 2019 Notice to customers when no analysis supporting such a designation had been conducted, nor had any of the procedures described in the Customer Agreement for declaring an account "abandoned" been followed. Moreover, at the time the Abandoned Securities Transfers began, Doubek and Walsh had been receiving complaints from customers impacted by the Forced Sales who protested they had not authorized *that* conduct. Apparently undeterred, Alpine continued its use of false attribution by adding "abandoned" to its library of deceptive labels. Although the misrepresentation was not about the value of the position, it was still material because it went to the fundamental ownership by the customer of their property. Indeed, the auto-reply message sent by Alpine to its customers gave the clearly false impression that customer property had already been transferred to state authorities when Alpine told customers: "Please contact your state for instructions on how to reclaim your assets." SOF ¶ 80.

Third, the scheme had a financial benefit to Alpine. Not only did the transfer of remaining positions allow Alpine to meet is business objective of rapidly closing accounts, but the Abandoned Securities Transfers also dovetailed with Walsh establishing the "Liquidate to Cover Debit" account which Alpine intended to use to recoup fees (as oppose to escheating valuable securities). SOF ¶ 79. In short, Alpine's financial interest clearly took priority over preserving customer property or returning maximum value to clients.

Finally, Alpine did not provide material information about customers' continuing ability to sell their securities. As its customers' agent and custodian of their securities, and having given no notice it would not honor the Customer Agreement, Alpine owed them a duty of loyalty and had authority only to do what the customers reasonably would have expected with their property, which it cannot be disputed did not include *sua sponte* attempting to send their property to state authorities. *See* Restatement (Second) of Agency § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters

connected with his agency."). By failing to inform customers that Alpine still had custody of their securities (and thus such securities were sellable or could be transferred), Alpine violated its duty to be honest and loyal to its principals.

Thus, the Abandoned Securities Transfers involved multiple types of deceptive conduct, any one of which alone is sufficient to establish Alpine's liability.

### b.   Alpine Acted with Scienter.

In view of Doubek and Walsh falsely labeling hundreds of customers' securities as "abandoned," sending out misleading information about the Abandoned Securities Transfers, proceeding in a matter decidedly in Alpine's (and not its customers') financial interest, and acting in direct contravention of the guidance given to Walsh from a state securities regulator, there can be no meaningful dispute that Doubek and Walsh deliberately engaged in deceptive acts. *See NVIDIA*, 768 F.3d at 1053. Their scienter is imputed to Alpine.

Nor can Doubek or Walsh meaningfully dispute that they were fully aware of the obligations Alpine had in its Customer Agreement and in its WSPs that described the procedures Alpine would use for inactive or abandoned accounts. SOF ¶¶ 12, 68-69. Here, Doubek and Walsh's decision to tell customers their securities were in the process of being escheated was made after they "discussed what possible options" they had to close remaining accounts and after Walsh told Doubek about a conversation Walsh had earlier in the year with a Utah-state securities regulator who had had identified the relevant portions of the Customer Agreement covering inactive and abandoned accounts as a way that Alpine could close accounts. SOF ¶ 67. The conversation thus showed their awareness of the Customer Agreement's provisions and regulatory guidance on how to proceed. But their disregard of those provisions and guidance went further, because in setting up the "Liquidate to Cover Debit" account, Walsh also disregarded the guidance he had received that Alpine would *not* be allowed to sell customer positions to compensate itself for the $5,000 monthly account fee it had imposed on customers. SOF ¶ 67. Not only should Alpine be held to be fully knowledgeable of its own agreements, but the fact that its CEO and COO specifically discussed regulatory guidance

and then totally disregarded it is additional evidence that they (and thus Alpine) intentionally engaged in wrongful conduct.

> ### c.   The Conduct Concerned Effecting Transactions or Attempting to Induce Customer Sales.

The scheme to falsely claim that customers had abandoned their securities positions was plainly related to Alpine's brokerage operations, that is "to effect any transaction" or to "induce or attempt to induce the purchase or sale of any security." 15 U.S.C § 78o(c)(1)(A). Here, the Abandoned Securities Transfers were made in the course of Alpine's operations as a broker and with a purpose of impacting the customers' abilities to engage in securities transactions, to influence customers' sales, or in connection with Alpine planning to make sales through the Liquidate to Cover Debit account.

As described above, the Abandoned Securities Transfers were undertaken as part of the "big picture" to close customers' accounts, which would occur only by the customer either liquidating positions (*i.e.*, selling) or transferring them out of Alpine. By forcibly removing positions from customers' accounts, Alpine intended to induce at least some of those customers to sell their securities, rather than have them escheated to states. This inducement was apparent in the months of notices to Alpine customers relaying that they could avoid Alpine's draconian actions by *liquidating* positions. SOF ¶¶ 30-31 (Exs. 16, 17, 18). Further, Doubek confirmed that he helped customers who complained about the Abandoned Securities Transfers restore their position to their account *if* the customer agreed to take possession of the securities or to *sell* the position. SOF ¶ 76. By forcing the hands of its customers Alpine clearly attempted to induce some of them to sell their securities.

In addition, the Abandoned Securities Transfers involved an intention on Alpine's part to "liquidate" some securities through transfers that would be made to the Liquidate to Cover Debit account. Alpine stated as much in the June 2019 Notice: "Alpine will liquidate enough positions in your account that have an active market to cover any open debits." SOF ¶ 70. The scheme thus had, at least in part, the intention for Alpine to undertake such sales, which is another basis to conclude the conduct was to effect a transaction in or attempt to sell a security.

#### d. Alpine Used Means of Interstate Commerce.

As with the Forced Sales, Alpine employees sent emails in furtherance of the Abandoned Securities Transfers, including sending messages from Utah to customers across the United States, SOF ¶¶ 57, 58, 70; indeed, there were approximately 35 positions falsely deemed abandoned for customers with Nevada addresses. SOF ¶ 72.

***

Both the Forced Sales and Abandoned Securities Transfers, each part of a "big picture" to prioritize Alpine's interests over those of its customers through deceit and other fraudulent means, warrant summary judgment on Claim Three of the Complaint against Alpine.

#### 2. Doubek and Walsh Aided and Abetted Alpine's Section 15(c)(1)(A) Violation.

Doubek and Walsh, who discussed, agreed, and implemented the plan to declare securities "worthless" and later falsely deem the 645 positions "abandoned" cannot successfully dispute that they aided and abetted Alpine's violation of Section 15(c)(1)(A). Aiding and abetting liability is established under the Exchange Act by proof of (1) an independent primary violation; (2) knowledge by the aider and abettor of the primary violation and of his role in furthering it; and (3) the aider and abettor's provision of "substantial assistance" to the primary violation. *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996).

Here, the primary violation of Section 15(c)(1)(A) by Alpine in Claim Three has been established, as set forth *supra*. If the Court's finding of a Section 15(c)(1)(A) violation rests exclusively on the Forced Sales, then Doubek and Walsh's aiding and abetting liability is established for all the reasons given in Section V.A, *supra*. The following thus addresses aiding-and-abetting liability for the Abandoned Securities Transfers.

With respect to knowledge of the violation, Doubek admitted in his Answer that he knew Alpine was carrying out unlawful securities transactions, DA ¶¶ 50-51, and has not disputed that Alpine violated Section 15(c)(1)(A), *id.* ¶¶ 60-62. In addition, both his and Walsh's knowledge of the wrongful conduct was evidenced in their discussion about "what possible options" they had to close remaining accounts and Walsh's rehashing of the guidance from a Utah-state securities

regulator to use the relevant portions of the Customer Agreement to close accounts. SOF ¶ 67. Thus, two principal executives of Alpine made a choice to rely on language from the Customer Agreement without fulfilling Alpine's attendant promises in that agreement to first have a basis and evidence for deeming a position "abandoned." Their knowledge of Alpine's violation cannot be meaningfully disputed.

Finally, both Doubek and Walsh substantially assisted Alpine's Abandoned Securities Transfers. Both Doubek and Walsh participated in deciding to declare positions "abandoned," SOF ¶¶ 65-67, and they each participated in drafting the June 2019 Notice that described that "[a]ll remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state," SOF ¶¶ 53-56. 70. Further, Doubek approved the June 2019 Notice before it was sent to customers. SOF ¶ 58. And, Walsh undertook the operational tasks needed to remove the positions from customer accounts and into the 1122 Accounts (SOF ¶ 71), which he followed by putting in place a misleading auto-reply message to customers relaying that there was nothing Alpine could do to further assist with their accounts (SOF ¶ 80-81). Each of these acts, and certainly them collectively, constituted substantial assistance in Alpine's fraud.

## VI.   <u>Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion for Summary Judgment on all Claims.

Dated: October 10, 2024                    Respectfully Submitted,

<div style="margin-left: 50%;">

/s/ James P. McDonald
James P. McDonald
Jacqueline M. Moessner
Admitted pursuant to LR IA 11-3
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, Colorado 80294
(303) 844-1000
mcdonaldja@sec.gov
moessnerj@sec.gov

</div>

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed with the Court on October 10, 2024, through the CM/ECF system, which will electronically notify all counsel of record and *pro se* parties authorized to receive electronic notifications.

/s/ *James P. McDonald*
Securities and Exchange Commission