X FILED RECEIVED
ENTERED SERVED ON
JUNE 03, 2025
CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY: /s/ RJDG DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**ALPINE SECURITIES CORPORATION, CHRISTOPHER DOUBEK, and JOSEPH WALSH, Defendants. Case No. 2:22-cv-01279-RFB-MDC**

**DEFENDANT CHRISTOPHER R. DOUBEK'S REPLY TO DEFENDANT ALPINE SECURITIES CORPORATION AND JOSEPH WALSH OPPOSITION TO DEFENDANT DOUBEK'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ADDITION OF JOHN HURRY AS A DEFENDANT**

My name is **Christopher Doubek**, and I'm submitting this reply to Defendant Alpine Securities Corporation and Joseph Walsh's ("Alpine") Opposition to Defendant Doubek's Second Motion to Dismiss (ECF No. 106). Alpine's opposition completely misrepresents my arguments and fundamentally fails to grasp the **severe coercion and threats** I faced from John Hurry, which directly led to the actions in question.

---

## The Court's Prior Ruling Didn't Fully Account for Hurry's Coercion

Alpine suggests that the Court's previous denial of my First Motion to Dismiss (ECF No. 39) definitively settled the issue of my individual liability, regardless of external direction. While I understand that individual conduct can form the basis of a claim, the **intense coercion and threats exerted by John Hurry** could not have been fully explored or understood at that early stage.

I've consistently argued that John Hurry dictated my actions. This wasn't just a matter of being passively "told" what to do; it was about Hurry, as the firm's principal, creating an environment of **duress through both explicit threats and implicit coercion**. This left me with no reasonable alternative but to comply. The real injustice here is being held solely accountable for actions taken under such extreme pressure, while the person truly responsible for Alpine's compliance failures is overlooked.

---

## My Testimony, in Context, Reveals Coercion and Scienter, Not a Lack of Direction

Alpine selectively quotes my deposition testimony to create a false narrative that I wasn't "told" to ignore regulations. They highlight my answers like "In those specific words? No" and "No, no one ever said that" when asked about explicit orders to move securities without notice. This is a disingenuous attempt to dismiss the reality of command through implied threats and coercion.

**Hurry directed the actions in question and knowingly controlled Alpine behind the scenes with full knowledge and intent.** John Hurry, as Alpine's principal and ultimate authority, communicated his directives through a blend of explicit demands and veiled threats, leaving no doubt about the consequences of non-compliance. While he might not have uttered the exact words "move stock without notice," his repeated and forceful instruction to **"Get it done,"** as my testimony confirms (Doubek Dep., Apr. 26, 2024, at 339:17-340:5), was delivered with clear coercive undertones. This wasn't a casual suggestion; it was an imperative from a superior known for punishing those who didn't meet his demands. The context of Hurry's directives, especially given the ongoing pressure regarding dormant accounts, strongly implied that quick, decisive action was expected, even if it meant cutting corners to achieve immediate results. This pressure, combined with Hurry's direct involvement and knowledge, clearly demonstrates his **scienter** regarding the improper nature of these directives. Alpine's corporate governance controls were, at best, lax and self-serving to its sole shareholder, John Hurry.

Crucially, John Hurry consistently displayed **little to no respect for regulations or regulators**. On many occasions, he referred to them as **"brainless bugger eaters"** with no understanding of Alpine's business or the industry as a whole. This ingrained contempt for regulatory compliance from the top down informed the coercive environment. My compliance stemmed from a **legitimate fear of professional retaliation and severe personal repercussions** if I failed to satisfy Hurry's demands. His threats weren't always explicit verbal pronouncements, but they were evident in his domineering management style, his history of micromanagement, and his willingness to impose severe penalties on subordinates who deviated from his expectations. This coercive environment meant that while the stated goal might have been "compliant" account closures, the **overriding directive**, enforced by Hurry's threats and his blatant disregard for regulatory adherence, was to resolve the issue rapidly. This created a situation where strict compliance felt impossible given the implicit pressures. It was under this duress that I made the decisions I did, believing it was the only way to meet Hurry's demands and avoid professional ruin.

Furthermore, **Hurry and/or Kelly called multiple times every day and late into the night** to follow up and criticize any lack of forward progress. These relentless calls served as a substitute for any written correspondence, allowing Hurry to conceal his direct orders and maintain his seemingly passive role. It's also vital to note that at every turn and before any action on my behalf, **I consulted with Ms. Fritz or Mr. Cruz, Alpine's in-house counsel, regarding the legality and regulatory compliance of Hurry's directives.** Despite these consultations, Ms. Fritz has repeatedly claimed privilege concerning these conversations, which would otherwise provide crucial guidance on the advice I sought and received.

---

## John Hurry's Conduct Mirrors Patterns of Control and Obfuscation in Corporate Misconduct

The tactics employed by John Hurry, particularly his reliance on verbal directives and avoidance of written communication, are not isolated incidents but reflect a pattern of behavior seen in other instances of corporate misconduct where controlling figures seek to insulate themselves from accountability. While Alpine attempts to frame my defense as a mere denial of knowledge, the reality is that Hurry deliberately created an environment of ambiguity, coersion and duress. This was highlighted by FINRA in their decision as well.

Hurry's consistent use of phone calls, often multiple times a day and into the night, in lieu of any formal written directives, was a calculated strategy. This allowed him to maintain a seemingly passive role while actively dictating actions and criticizing any perceived lack of "forward progress." This intentional avoidance of a paper trail, coupled with his expressed contempt for regulators, directly parallels the methods employed by executives in other high-profile cases who sought to achieve their objectives while strategically obscuring their direct involvement and intent. It is not an "idiot defense" on my part; rather, it highlights Hurry's deliberate creation of a system designed to shield his own directives and scienter from scrutiny.

His full knowledge and intent in controlling Alpine behind the scenes, facilitated by what I maintain were lax corporate governance controls that primarily served him as the sole shareholder, are central to understanding the true nature of the directives I received. This pattern of a controlling principal knowingly directing actions that circumvent regulatory compliance, while simultaneously attempting to conceal those directives through informal channels, demonstrates Hurry's clear scienter and ultimate responsibility for the firm's actions.

---

## Alpine's Attack on My Credibility is a Distraction

Alpine attempts to discredit me by referencing a separate alleged "theft" and by claiming I'm "changing my story" regarding James Kelly. These claims are irrelevant to the core issue of John Hurry's coercive control over the operations that are the subject of the SEC's claims.

The alleged theft and collusion to which Alpine refers has **never been reported to any authority or regulatory body**. These are nothing more than allegations made to suggest an alternative theory to support Hurry's directives and actions. The truth is that **Mr. Kelly corroborated in his testimony the actions he and Hurry took to achieve their intended goals at Hurry's direction.** To suggest that an unsubstantiated accusation of a separate matter should discredit my defense in *this* case is an attempt to further smear my character rather than address the substance of my arguments regarding Hurry's directives.

Furthermore, any perceived shift in my focus between John Hurry and James Kelly doesn't undermine my core argument of coercion. Both individuals operated within Hurry's sphere of influence. Kelly, as a **partner**, was also subject to Hurry's directives and contributed to the

overall coercive pressure. **Mr. Kelly acted in concert with Hurry to accomplish Hurry's objectives as maintained directly by Mr. Kelly in his testimony.** The chain of command undeniably places Hurry at the top, dictating the operational parameters and the pressure under which I was forced to operate.

---

## The NAC Decision Does Not Absolve Hurry

I acknowledge that the FINRA National Adjudicatory Council ("NAC") decision superseded the earlier Hearing Panel Decision, and I am not relying on any abrogated findings. However, Alpine's assertion that the NAC decision "plainly and properly finds that it was defendant Doubek who directed the movements of stock at issue" and "certainly did not find that Mr. Hurry directed or was responsible for those stock movements" is a dramatic oversimplification designed to deflect from Hurry's overarching actions.

While the NAC decision may focus on my direct actions, it doesn't, and can't, negate the **coercive environment established by Hurry**. The NAC decision addresses the *mechanics* of the stock movements, but not the *impetus* or the *duress* under which those actions were taken. A finding that I "directed" the movements doesn't preclude the fact that I was compelled to do so by Hurry’s threats and coercive directives. The NAC decision must be read within the context of the operational control and pressure Hurry exerted, which set the stage for these events.

Regarding other references, while not directly tied to the specific findings of the prior FINRA Hearing Panel, I intended the references to the Nevada decision and the Hyundai Motors Notice of Termination to illustrate the **pattern and adjudication of John Hurry's business practices and control**. This provides crucial context to the coercive environment he created. While Alpine correctly notes that these documents may be based on superseded information, the underlying patterns of control and Hurry's history of involvement in various enterprises remain relevant to demonstrating his pervasive influence and the nature of the pressure he exerted on those under his command.

---

## Conclusion

My Second Motion to Dismiss isn't a baseless rehashing of old arguments. It's a necessary request for the Court to consider the full extent of the compelling circumstances, including the threats and coercion, under which I acted. Alpine's opposition fails to address this critical element of duress and attempts to shift complete blame onto me, an individual operating under the severe and consistent pressure from John Hurry.

Based on everything I've presented, I respectfully request that the Court grant my Second Motion to Dismiss, or alternatively, that the Court recognize the compelling nature of the coercion and threats exerted by John Hurry as a critical factor in assessing my liability.

Dated: June 3, 2025

Respectfully submitted,

---

**Christopher Doubek** Defendant, Pro Se