1
2
3
4                   **UNITED STATES DISTRICT COURT**
5                        **DISTRICT OF NEVADA**
6                              * * *
7    UNITED STATES SECURITIES AND
     EXCHANGE COMMISSION,
8
                      Plaintiff,              Case No. 2:22-cv-01279-RFB-MDC
9
10          v.                                          **ORDER**

11   ALPINE SECURITIES CORPORATION, *et
     al.*,
12                    Defendants.
13
14
15          Before the Court are Plaintiff United States Securities and Exchange Commission's

16   ("SEC") Motion for Summary Judgment (ECF No. 81), Defendants Alpine Securities Corporation

17   ("Alpine") and Joseph Walsh's Motion for Partial Summary Judgment (ECF No. 87), and

18   Defendant Christopher Doubek's Motion to Dismiss (ECF No. 103). For the following reasons,

19   Plaintiff's Motion for Summary Judgment is granted, and Defendants' Motion for Summary

20   Judgment and Motion to Dismiss are denied.

21

22       **I.    PROCEDURAL HISTORY**

23          The SEC filed the Complaint in this matter on August 10, 2022. See ECF No. 1. On October

24   18, Defendants Alpine and Walsh moved to dismiss or stay this matter. See ECF No. 14. On the

25   same day, Alpine and Mr. Walsh identified one interested party to the litigation: SCA Clearing

26   LLC—a parent company based in Arizona. See ECF No. 15. On October 18, Defendant Doubek,

27   who is proceeding *pro se*, separately moved to dismiss on the ground that other parties should be

28   joined. See ECF No. 17. The Court held a hearing on Defendants' motions on August 15, 2023,

1    and, for the reasons stated at the hearing, denied them. See ECF No. 39.

2           On September 15, 2023, the Court entered a Stipulated Discovery Plan and Scheduling

3    Order ("Scheduling Order"). See ECF No. 41. Defendants filed answers on October 16 and 20.

4    See ECF Nos. 48, 50. The Scheduling Order was amended several times on the Parties' motions,

5    and discovery concluded on August 27, 2024. See ECF Nos. 63, 66, 73, 76.

6           On October 10, 2024, Plaintiff filed a motion for summary judgment and an accompanying

7    declaration. See ECF Nos. 81, 82. Defendants Alpine and Walsh responded on October 31. See

8    ECF No. 90. Defendant Doubek did not respond to the SEC's Motion. Plaintiff replied on

9    November 22. See ECF No. 96.

10          On October 18, 2024, Defendants filed a motion for partial summary judgment. See ECF

11   No. 87. Plaintiff responded on November 8 and filed an accompanying declaration. See ECF Nos.

12   92, 93. Defendants replied on November 22. See ECF No. 95.

13          On April 14, 2025, the Court set a hearing on the two pending motions for May 28, 2025.

14   See ECF No. 100. On May 14, Defendant Christopher Doubek filed a motion to dismiss. See ECF

15   No. 103. On May 21, Plaintiff responded. See ECF No. 104. On May 27, Defendants Walsh and

16   Alpine responded. See ECF No. 106. That same day, Doubek filed a reply. See ECF No. 105. On

17   May 28, the Court held a hearing on the pending motions. See ECF No. 107.

18          The Court's Order follows.

19

20   **II.    FACTUAL BACKGROUND**

21          The Court makes the following findings of undisputed and disputed facts.

22          **A. Undisputed Facts**

23          Alpine was at all relevant times a self-clearing broker-dealer registered with the SEC and

24   based in Salt Lake City, Utah. Alpine was owned by SCA Clearing LLC ("SCA Clearing"). SCA

25   Clearing was owned by a series of trusts benefiting John Hurry and his family members, until

26   August 2019, after which period John Hurry became the sole member of SCA Clearing. Alpine's

27   business primarily involved clearing microcap stocks for its own retail customers and for other

28   brokers. Microcap or "penny" stocks are low-priced shares of small companies that generally trade

over the counter ("OTC"). Such stocks are each a "security" under relevant provisions of the federal securities laws. Alpine's retail customers had non-discretionary brokerage accounts, and Alpine did "not permit discretionary trading in any form."

Doubek joined Alpine as its sole board member in December 2018 and became Chief Executive Officer ("CEO") on April 7, 2019, and Chief Operating Officer ("COO") on May 10, 2019. When he was hired, Doubek lacked the required securities licenses to be a "principal" of Alpine, and thus he did not assume the formal title of CEO until he re-acquired those licenses. Walsh became Alpine's COO in September 2018 and remains in that role. Walsh served as Alpine's interim CEO from December 2018 until April 7, 2019. Both Doubek and Walsh had substantial experience in the securities industry. Doubek had approximately 25 years of experience, including as CEO of a trading firm that had 130 employees. Walsh had worked at multiple firms in the industry, generally in operations, since 1981. Doubek and Walsh were registered representatives of Alpine and also served as supervisory personnel or "principals." Doubek and Walsh had to qualify for their roles by passing examinations concerning the applicable regulatory rules and standards.

Alpine employees used email addresses with the domain "@alpine-securities.com." As of March 2019, Alpine also directed its customers to submit their questions and requests to "houseaccounts@alpine-securities.com" (the "House Accounts Email"). The House Accounts Email was accessible to, and used by, multiple Alpine employees, including Doubek and Walsh.

Alpine used a customer agreement ("Customer Agreement") for both individual and corporate retail brokerage customers. Alpine had a written supervisory procedures ("WSP") manual that set forth its operational policies for employees. The WSP manual effective during the period relevant here was dated October 1, 2015.

Alpine reported losses for the second and third quarters of 2018. Around July 2018, Alpine began to take steps to discontinue its retail brokerage business and close those customers' accounts. In August 2018, Alpine increased its retail customers' account fee from $100 per year to $5,000 per month—i.e., $60,000 yearly.

### i. The Forced Sales of Supposedly Worthless Securities.

Alpine made available on its website a "Worthless Securities" form (the "Worthless Securities Form") that an Alpine retail customer could submit to request that a position which had become non-marketable or worthless be sold to Alpine for $0.01, generally to obtain a tax benefit from capital loss. For customers who submitted the Worthless Securities Form, Alpine processed the trade requested by the customer for $0.01 per position. Alpine's WSPs indicated that "[s]ales of 'worthless' securities as an accommodation to customers are reportable (Sometimes these positions are not sold on a per-share basis but may be sold for one penny or one dollar ['penny for the lot' transaction].)." Alpine maintained a proprietary account in the name "Alpine Securities Worthless Securities" (the "Worthless Securities Account") into which Alpine sold and held securities processed as "worthless" from customer accounts. When Alpine sold a securities position from a customer's account to the Worthless Securities Account, it reported the transaction to FINRA and the market and generated a trade confirmation for the customer. Alpine owned the securities in the Worthless Securities Account.

Beginning in December 2018, Alpine's senior management, including Doubek and Walsh, discussed using a "negative consent" process to sell customer's securities positions that had a value of $400 or less. The "negative consent" process involved attempting to notify a customer about the firm's planned action (here, to sell securities) and then, absent objection from the customer, the firm undertaking the described action. Thus, the negative consent process did not involve receiving affirmative consent or a trade request from a customer, but rather was based on a lack of objection to Alpine's proposed course of action. Walsh suggested using a "negative consent" process because a prior firm at which he worked had used that process for a different purpose.

Walsh suggested using a $400 threshold for deeming a position "worthless." This definition of "worthless" meant that the value of a position was less than the costs Alpine and transfer agents imposed to maintain or liquidate that position. Walsh selected $400 as "kind of the opening attempt to close some of these old inactive, abandoned, orphaned house accounts." The amount represented the "the minimum fee that would potentially have been assessed to liquidate that – those shares in the open market, assuming, again, that there was a market for those shares."

In January 2019, Walsh, along with attorney D. Michael Cruz and then-CCO Jason Kane, prepared a draft "Negative Response Letter" to be sent to customers using an exemplar Walsh obtained from his prior firm. On or near March 15, 2019, Alpine sent copies of the Negative Response Letter to customers with positions valued at $400 or less. The letter read, in part, "The security listed above has been deemed 'worthless' by Alpine securities," and "[a]ll your shares of the security listed above will be sold to our 'worthless securities account' for $0.01 proceeds . . . ." Customers could object to the sales. Doubek approved the Negative Response Letter before it was sent to customers.

Alpine sent full-page notices as part of its February, March, and April 2019 account statements with the caption: "IMMEDIATE ACTION REQUIRED." These notices included the following advisement for positions worth under $400 (with minor alterations): "Positions Worth Less than $400: Please submit a Worthless Securities Form found on our website to the email above and request account closure once the worthless security is processed. For positions worth less than $400 or that have no active trading market, liquidation may incur greater fees and commissions than the position value." These notices were a "collaborative effort" of at least Doubek, Walsh, Kane, and Cruz. Doubek approved sending them. The April 30, 2019, Notice stated, in part: "Alpine Securities will no longer accept any orders to liquidate stocks." Alpine was accepting and would continue to accept orders to sell or liquidate stocks as of April 30, 2019.

On May 28 and 29, 2019, Walsh, assisted by a member of the operations staff, sold customer positions valued at less than $400 to Alpine's Worthless Securities Account. After completing the trades of positions worth under $400 on May 29, 2019, Doubek told Walsh he "wanted to bump the threshold up between [$]400 and [$]1,500." Walsh told Doubek, "I'm going to need that in writing." Walsh understood that Doubek had the authority to direct him to raise the threshold to $1,500. He did express concerns to Doubek that Alpine had not provided prior notice to customers.

On May 30, 2019, Doubek emailed Walsh: "Joe, per our discussion regarding the continuation of worthless trades from our existing accounts, please extend the process you employed with a threshold of $400 to now including [sic] include $1,500 position value as this

would be the cost to process a physical certificate." Doubek, in his capacity as CEO, made the decision to deem all positions worth $1,500 or less as "worthless" and instructed Walsh, as COO, to sell all positions worth less than $1,500 to Alpine. The $1,500 figure was based on a then-recently increased fee Alpine charged to make a type of stock withdrawal, which went from $1,000 to approximately $1,500. The $1,500 figure was chosen to expedite closing customer accounts, which could not occur if cash or securities remained in a customer account.

On May 30, 2019, Walsh conducted computer searches at Alpine to identify positions valued by Alpine's systems at $1,500 or less. Walsh, assisted by a member of the operations staff, sold all customer positions that Alpine's system valued between $400 and $1,500 to the Worthless Securities Account for $0.01 each (the "Forced Sales"). Walsh did not consult any compliance manuals or documents before executing the Forced Sales. The Forced Sales consisted of 294 positions held by approximately 265 customers. The Forced Sales at issue here do not include the positions worth under $400 that Walsh traded on May 28 and 29, 2019. Each of the Forced Sales was made from a non-discretionary customer account. Alpine did not have customer authorization for any of the Forced Sales and had not provided customers with any notice that it would sell those securities as "worthless." Alpine did not conduct any analysis to determine if there was a willing buyer in the market for any of the Forced Sales. The combined approximate statement value of the Forced Sales (that is positions over $400) was $267,956. The Forced Sales were not trades solicited or authorized by customers. As part of the Forced Sales, 17 customer positions were sold for securities traded on exchanges like NYSE or NASDAQ. Additionally, 66 different securities were treated as "worthless" for purposes of the Forced Sales even though other customers at Alpine (approximately 147 accounts) held larger quantities of the same 66 positions but were not subject to the Forced Sales. Alpine sent trade confirmations of the Forced Sales to affected customers. At least 9 of those customers had addresses in Nevada.

Alpine started receiving customer complaints about the Forced Sales by at least May 31, 2019. In responding to a complaint, the House Accounts Email informed a customer: "All positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value. Please refer to the customer notification letter attached to April

statements." However, the April 30, 2019, Notice had no information about securities with a market value between $400 and $1500 being declared worthless by Alpine.

In early June 2019, Doubek and Walsh helped prepare another full-page notice to include with the May 2019 account statements that stated, among other things, "all positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value." On June 7, 2019, Walsh sent an email to Alpine employees, attaching the "Final" version of the June 2019 Notice, and wrote: "If any customer asks about his positions being removed as worthless, Send [sic] them this letter. This was included with all May Customer Statements." However, 17 positions declared worthless on May 30, 2019, were securities that publicly traded on exchanges and which could have been transferred for $100 through an automated system called "ACAT" to another broker. These included positions in MetLife, Ford Motor, and Broadcom, whose value on the day of the transfers exceeded $0.01.

On or after June 7, 2019, Alpine sent the June 2019 Notice to at least some customers, including by email. Doubek approved sending the June 2019 Notice to customers. Walsh began reversing the Forced Sales in bulk after FINRA interviewed him under oath in July 2019. Discrete transactions were also reversed on an individual basis on at least May 31, June 11, and June 12, 2019.

### ii.  The "Abandoned" Securities Transfers.

In early 2019, Walsh opened holding accounts at Alpine for each of the 50 states to segregate and track customer property for purposes of eventually transferring customers' unclaimed property to those states. These unclaimed property accounts each had an internal Alpine account number that began with "1122" (the "1122 Accounts"). The 1122 Accounts were set up to satisfy state-law obligations to handle unclaimed property (potentially for escheatment to the state) when an account was dormant or a customer died. While it was an internal Alpine holding account, the listed account holder for at least some 1122 Accounts was the name of a state or an official; for example, the account for unclaimed property related to customers in Missouri was in the name of: "State of Missouri, Missouri State Treasurer Eric Schmitt." Walsh believed that closing Alpine's retail accounts was "the big project, the big picture," and handling worthless

securities was the "first wave."

After the worthless securities sales "project was completed," Doubek told Walsh he had received instructions to close all remaining Alpine accounts by the end of June 2019. Doubek and Walsh "discussed what possible options" they had to close remaining accounts and, based on previously notifying customers that Alpine was "getting out of the direct retail business," they discussed "the fact that these accounts were inactive, orphaned, [and] abandoned" because customers had not responded to Alpine's notices. Walsh suggested they "escheat these accounts to their home states" where they would "be held in their state unclaimed property account" and a customer could claim their property. Walsh told Doubek about a conversation he had earlier in 2019 with a Utah-state securities regulator who had advised Walsh to consider the portion of the Customer Agreement covering inactive and abandoned accounts as a way that Alpine could close accounts. The regulator had also advised that the state would not allow Alpine to liquidate customer positions to cover the $5,000 monthly account fee.

Alpine had policies in its WSPs covering lost security holders. The policies required, among other things, Alpine to (1) make two attempts to contact customers who are natural persons and then (2) conduct two searches using information databases, which had to be 6–12 months apart.

Alpine referred to a plan to move all remaining positions and to deem them "abandoned" in the June 2019 Notice: "Effective June 1, 2019 Alpine Securities will take action to close all remaining accounts. This means no further statements will be generated for your account. Alpine will liquidate enough positions in your account that have an active market to cover any open debits. All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state." Between June 7 and 24, 2019, Walsh transferred all remaining customers' securities positions to the 1122 Accounts (the "Abandoned Securities Transfers") for the state corresponding to the customer's address.

The Abandoned Securities Transfers consisted of 645 positions held by approximately 545 retail customers. At least 35 of those transfers were for customers who had addresses in Nevada. The combined statement value for all Abandoned Securities Transfers was approximately

$54,591,302. Alpine did not remunerate any customer or generate trade confirmations for any of the Abandoned Securities Transfers. The Abandoned Securities Transfers removed a security position from the customer's brokerage account and placed the position in an account not in the customer's name nor under their control. Doubek helped customers who complained about the transfers restore their position to the customer's account if the customer agreed to take possession of the securities or to sell them. No Alpine employees, including Doubek or Walsh, analyzed if the positions moved to 1122 accounts qualified as "inactive" or "abandoned" under the Customer Agreement. As part of the process to close remaining accounts, Walsh renamed an existing Alpine proprietary account as the "Liquidate to Cover Debit" account. The account was established to transfer "potentially real marketable securities" to this account to pay outstanding customer debits before transferring any remaining securities to the state escheatment accounts. This was based on instructions from Doubek, who did not want to escheat marketable securities.

On June 25, 2019, Walsh and Doubek set up an auto-reply message for the House Accounts Email that stated, among other things, "All assets in your accounts have been submitted for processing to your state of residence for Unclaimed Property/Escheatment. Please contact your state for instructions on how to reclaim your assets." Walsh put up that auto-reply message because Alpine "was getting slammed" from customers complaining about Alpine's actions. On June 25, 2019, Cruz emailed Doubek and forwarded the "Automatic Reply – House Accounts" email, writing: "Are you saying that all the remaining accounts at Alpine have been abandoned and have become subject to the escheatment process? Depending on the state, it takes 3-5 years to deem an account abandoned."

On June 27 and 28, 2019, Walsh reversed the Abandoned Securities Transfers and returned the customers' positions to their accounts. Alpine reversed all transfers to the Liquidate to Cover Debit account by August 30, 2019.

**B.  Disputed Facts**

The Parties dispute whether certain conduct is properly attributable to Alpine. For example, on the issue of Alpine's alleged failure to provide notice to certain customers, the Parties dispute: whether Alpine had knowledge that notice had not been sent; whether the failure to send notice

was a result of "miscommunication" at the firm; and whether Mr. Doubek's action were deliberate and intended to avoid termination. The Parties agree on the various actions taken by Mr. Doubek, but dispute whether he was acting within the scope of his employment or for the benefit of Alpine.

Additionally, while the Parties agree that the combined approximate statement value of the Forced Sales was $267,956 and the combined statement value for all Abandoned Securities Transfers was approximately $54,591,302, they dispute whether that statement value is useful for determining, or even gauging, the actual value of these positions.

### III.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried their burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cnty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

### IV.    DISCUSSION

First, the Court will consider Plaintiff's Motion for Summary Judgment, which covers the first and second claims—concerning the Forced Sales—and the third and fourth claims— concerning the Abandoned Securities Transfers. Notably, the third and fourth claims are also the subjects of Defendants' Motion for Partial Summary Judgment. Then, the Court will then turn to

1  Defendant Doubek's Motion to Dismiss.

2  **A. Claims One and Two**

3  Based on the Forced Sales, the SEC alleges that Defendants violated Section 10(b) of the

4  Exchange Act, and Rules 10b-5(a) and 10b-5(c) thereunder, and Section 17(a)(1) of the Securities

5  Act. Under the Exchange Act, it is unlawful to (i.) "employ any device, scheme, or artifice to

6  defraud" or (ii.) "engage in any act, practice, or course of business which operates or would operate

7  as a fraud or deceit upon any person" in connection with the purchase or sale of securities. See 17

8  C.F.R. § 240.10b-5(a) & (c); see also 15 U.S.C. § 78j(b). Meanwhile, Section 17(a)(1) of the

9  Securities Act prohibits the same conduct in the offer or sale of securities. See 15 U.S.C.

10  § 77q(a)(1). Courts have interpreted these provisions to create what is known as "scheme liability."

11  See e.g., Sec. & Exch. Comm'n v. Dain Rauscher, Inc., 254 F.3d 852, 855 (9th Cir. 2001) ("Section

12  17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5, prohibit

13  fraudulent conduct or practices in connection with the offer or sale of securities."); Sec. & Exch.

14  Comm'n v. Stein, 906 F.3d 823, 830 (9th Cir. 2018) ("These antifraud provisions prohibit schemes

15  to defraud . . . .").

16  To allege a claim for scheme liability, a plaintiff must allege the elements of a securities

17  fraud claim. See In re Galena Biopharma, Inc. Sec. Litig., 117 F.Supp.3d 1145, 1192 (D. Or. 2015)

18  (citing Stoneridge Invs. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 158 (2008)). As

19  such, liability under Sections 17(a)(1) and Rules 10b-5(a) and (c) in an action brought by the SEC

20  requires evidence of: (1) a device or scheme to defraud someone (2) in connection with the

21  purchase or sale of a security (3) with scienter and (4) by means of interstate commerce. See Sec.

22  & Exch. Comm'n v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing Dain Rauscher, Inc., 254

23  F.3d at 855). The Court addresses each of these elements in turn.

24  **i. *A Device or Scheme to Defraud.***

25  "To be liable for a scheme to defraud under Section 17(a) . . . , a defendant must have

26  'committed a manipulative or deceptive act in furtherance of the scheme.'" Sec. & Exch. Comm'n

27  v. Hui Feng, No. 15-cv-09420, 2017 WL 6551107, at *11 (C.D. Cal. Aug. 10, 2017) (quoting

28  Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997)), aff'd 935 F.3d 721. The plaintiff must

demonstrate that the defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds by Simpson v. Homestore.com, Inc., 519 F.3d 1041 (9th Cir. 2008). "It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." Id. (footnote omitted).

It is undisputed that Defendants Alpine, Doubek, and Walsh sold positions worth between $400 and $1500 held in more than 250 customer accounts without prior notice to any affected customer. In other words, these customers were not advised that Alpine would be selling their property to itself for a penny in return. Through a negative consent, Defendants informed customers who held positions that were worth less than $400 that the aforementioned sale might occur. But Defendants did not provide this notice to customers whose positions exceeded $400. Defendants' decision not to provide the same "negative consent," (or any) notice with respect to Forced Sales valued at $1,500 or less, deprived Alpine's account holders of critical information about the sales Alpine was contemplating. Walsh then executed these unauthorized trades based on Doubek's instructions, and both were involved in preparing notices telling the customers that their property was "worthless." This was part of Alpine's broader goal to close accounts, and it was not done to obtain the maximum value and return on customers' holdings.

Based on the foregoing, the Court finds that the Forced Sales serve as a basis for establishing scheme liability. See Sec. & Exch. Comm'n v. Zandford, 535 U.S. 813, 821–22 (2002) (concluding that a stockbroker's sale of client securities, and his subsequent misappropriation of the proceeds of that sale, was deceptive and violated Rule10b-5 because it was not authorized by, or disclosed to, the clients and was thus properly viewed as a course of business that used fraud and deceit); Sec. Inv. Prot. Corp. v. Vigman, 803 F.2d 1513, 1519 (9th Cir. 1986) (holding that unauthorized transactions in customer's brokers accounts could give rise to a claim under Section 10(b)). It is well established that an undisclosed intent to misappropriate funds is sufficient to establish scheme liability on a motion for summary judgment. See, e.g., Sec. & Exch. Comm'n v.

1   Laura, 680 F.Supp.3d 204, 233 (E.D.N.Y. 2023); Commodity Futures Trading Comm'n v.

2   McDonnell, 332 F.Supp.3d 641, 720 (E.D.N.Y. 2018); Zandford, 535 U.S. at 819–20.

3   Furthermore, the Forced Sale was one of several steps taken to achieve the firm's goal of closing

4   accounts. See, e.g., Sec. & Exch. Comm'n v. Husain, No. 2:16-cv-03250ODWE, 2017 WL

5   810269, at *9 (C.D. Cal. Mar. 1, 2017) (finding the "case involve[d] a scheme in the most

6   fundamental sense" because defendants created "a plan with defined, repeated steps . . . executed

7   for a specific purpose" and involving deceitful acts beyond misstatements and omissions).

8          Additionally, the undisputed facts demonstrate that Defendants engaged in conduct that

9   "had the principal purpose and effect of creating a false appearance of fact in furtherance of a

10  scheme." Hui Feng, 2017 WL 6551107, at *11. Namely, Plaintiff alleges that Defendants informed

11  customers that their position were "worthless" even though, for example, 17 of the positions traded

12  on national exchanges, where any general market sale would have exceeded one penny in

13  remuneration to the customer. Additionally, if the securities Alpine, Doubek, and Walsh deemed

14  "worthless" were truly so, then the position should have had the same value regardless of the

15  number of shares held. However, Alpine treated 66 securities as "worthless" for these purposes

16  even though other customers at Alpine—i.e., approximately 147 accounts—holding larger

17  amounts of the same 66 securities were allowed to keep their positions and did not have their

18  positions sold on May 30, 2019. Defendants present no evidence that they conducted any analysis

19  of the positions to see if there was a willing buyer in the market, much less to recognize that some

20  of them traded on national exchanges like NYSE and NASDAQ.

21         Furthermore, in the April 30, 2019, Notice drafted collaboratively by Walsh and Doubek,

22  Defendants told customers that Alpine was no longer accepting requests to liquidate positions,

23  even though they were helping some clients do so. Defendants argue that they were accurately

24  informing customers that they no longer had representatives who could assist customers with sales

25  of securities. The fact that they, in some instances, still tried to assist customers did not make that

26  statement false. However, informing customers that they could no longer liquidate their positions

27  just before Alpine engaged in a forced sale is a misrepresentation as it represented to customers

28  that they had no choice and no opportunity to seek liquidation themselves. Additionally, on May

31, 2019, the House Accounts Email—which copied Walsh—falsely told one customer that the April 30, 2019, Notice had described the Forced Sales, when it had not.

Walsh and Doubek also prepared a June 2019 Notice that informed customers that their positions were "worthless," stating that "the cost to transfer these securities exceed[ed] the[ir] value." Yet, Defendants had done no analysis on this point. Defendants argue that the costs of transferring these securities included not only Alpine's costs, but also those imposed by DTC and transfer agents. Therefore, they were worthless. However, they do not provide evidence that they engaged in such an analysis before the Forced Sales or that they communicated how they decided what was "worthless" to the customers. Finally, Defendants fail to explain why some customers with the same "worthless" securities did not have their positions sold.

## ii.  *In Connection with the Purchase or Sale of a Security.*

Under this element, "the fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves." Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017, 1026 (9th Cir. 1999). "While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction." Id. Misrepresentations about the nature of a security are "surely" connected to that security. See Fleming v. Charles Schwab Corp., 878 F.3d 1146, 1156 (9th Cir. 2017).

The Forced Sales were each a sale of stock from customers' accounts to Alpine's proprietary Worthless Securities Account for one penny. Alpine generated trade confirmations for each sale and reported these trades to FINRA. Thus, the conduct clearly occurred as part of the sale of securities.

## iii.  *Scienter.*

In a securities fraud case, to satisfy the element of scienter, "the plaintiffs must show that defendants engaged in '*knowing*' or '*intentional*' conduct." S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008); Abdo v. Fitzsimmons, No. 17-cv-00851-TSH, 2021 WL 616324, at *11 (N.D. Cal. Feb. 17, 2021). "Reckless conduct may also constitute scienter." Todd, 642 F.3d at 1215; Killinger, 542 F.3d at 782; see also Sec. & Exch. Comm'n v. Platforms Wireless Int'l Corp.,

617 F.3d 1072, 1093 (9th Cir. 2010) ("[S]cienter requires either 'deliberate recklessness' or 'conscious recklessness.'"). "Reckless conduct is a highly unreasonable act or omission that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Todd, 642 F.3d at 1215 (quoting Dain Rauscher, Inc., 254 F.3d at 856). "'Scienter can be established by direct or circumstantial evidence.'" Gebhart v. Sec. & Exch. Comm'n, 595 F.3d 1034, 1041 (9th Cir. 2010) (citations omitted).

Doubek and Walsh each acted with scienter. Each knew that no notice had been provided to the customers impacted by the Forced Sales, and they were previously involved in providing the negative consent notice to customers with positions under $400. Each was a registered representative and aware of their obligations to customers; indeed, Doubek had just retaken licensing examinations in the months prior to authorizing the Forced Sales. Despite receiving no customer authorization, they raised the threshold to $1,500 to expedite closing customer accounts. Defendants argue that Mr. Walsh did not have scienter because he "refused" to engage in the Forced Sales. Nonetheless, he asked Mr. Doubek to provide the instruction in writing and then engaged in sending the notices.

The central question is whether Doubek and Walsh's scienter can be imputed to Alpine. In the case In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 475 (9th Cir. 2015), the Ninth Circuit considered whether a CEO's scienter could be imputed to his corporate employer. The court held that a corporation is responsible for a corporate officer's fraud committed "within the scope of his employment" or "for a misleading statement made by an employee or other agent who has actual or apparent authority." Id. at 476 (citation omitted); see also Mild v. PPG Indus., Inc., No. 2:18-cv-04231-RGK-JEM, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) ("That is, conduct by a corporation's senior controlling officers may be attributed to the corporation itself to establish corporate liability on section 10(b) claims when those officers 'were acting within the scope of their apparent authority.'"). Defendants do not seem to contest that Mr. Doubek was acting within the scope of his apparent authority. They do argue that Mr. Hurry wanted to close orphan and dormant accounts, but that he assumed Mr. Doubek would use compliant means to

achieve this goal. Regardless, when Mr. Doubek and Mr. Walsh engaged in certain actions, such as the Forced Sales, they were promoting the firm's goal of closing accounts. Therefore, they were acting within the scope of their employment.

Instead, Defendants primarily argue that Mr. Doubek's actions, designed to benefit himself, cannot be viewed as the conduct of the firm. They rely on the "adverse interest exception" where "a rogue agent's actions or knowledge are 'not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.'" In re ChinaCast Educ. Corp. Sec. Litig, 809 F.3d at 476. The adverse interest exception is narrow and generally requires "an agent to completely abandon the principal's interests and act entirely for his own purposes." USACM Liquidating Tr. v. Deloitte & Touche LLP, 764 F.Supp.2d 1210, 1218 (D. Nev. 2011), aff'd sub nom. USACM Liquidating Tr. v. Deloitte & Touche, 523 Fed.Appx. 488 (9th Cir. 2013) (unpublished disposition). Courts generally require total abandonment to invoke the adverse interest exception because "[t]his rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party . . . ." USACM Liquidating Tr., 764 F.Supp.2d at 1218 (quoting Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466–67 (N.Y. 2010)). The burden of proving the exception will fall to Alpine. See Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co., 964 F.Supp.2d 1128, 1145 (N.D. Cal. 2013).

Defendants have failed to present evidence that Mr. Doubek's and Mr. Walsh's actions were solely for their own benefit. They argue that Mr. Doubek was accused of fraud and stealing from the company, but they have not presented evidence connecting how the Forced Sales played into this alleged fraud or in any way made money for Mr. Doubek. Instead, it seems the Forced Sales primarily aided the firm's goal of closing accounts. After all, Mr. Doubek did not sell the shares to himself. The Forced Sales involved selling the positions to *Alpine* for only a penny. Furthermore, there is no evidence that Mr. Walsh was engaged solely for his own purpose and he took significant acts to aid in the Forced Sales. Therefore, because there is no evidence that Mr. Doubek acted solely out of his own interest, "this most narrow of exceptions" does not apply.

See, e.g., In re CBI Holding Co., 529 F.3d 432, 448 (2nd Cir. 2008); In re Crazy Eddie Sec. Litig., 802 F.Supp. 804, 817 (E.D.N.Y. 1992) (finding when an agent acts both for himself and for a principal, the agent's knowledge is imputed to the principal even if the agent's primary interest is inimical to the principal). Defendants have failed to present evidence that Mr. Doubek's relations to Alpine specifically concerning the Forced Sales were "so adverse as practically to destroy the relation of agency." Hewlett Packard Co., 964 F.Supp.2d at 1145 (citation omitted). The record reflects that Mr. Doubek engaged in the Forced Sales in order to close Alpine accounts per the express wishes of the firm. Therefore, Mr. Doubek—and certainly Mr. Walsh—did not "completely abandon the principal's interests and act entirely for [their] own purposes." USACM Liquidating Tr., 764 F.Supp.2d at 1218 (citations omitted).

Further, Plaintiff cites to the "exception to the exception" wherein "the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority." In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d at 477. The Complaint alleges that customers understandably relied on the notices provided by Mr. Doubek and Mr. Walsh, "which were made with the imprimatur of the corporation that selected [them] to speak on its behalf[.]" Id. Therefore, these innocent third parties relied on their apparent authority on behalf of Alpine. Therefore, even if the "adverse interest exception" applies in this case—and Defendants have failed to provide sufficient evidence that it does—it cannot shield Alpine from liability because their customers relied on Mr. Doubek and Mr. Walsh's statements. Therefore, Mr. Doubek and Mr. Walsh's scienter should be imputed to Alpine.

### iv. *By Means of Interstate Commerce.*

The undisputed facts also show that Defendants used means of interstate commerce as part of their fraudulent scheme, including by sending emails from Salt Lake City to affected customers outside of Utah. The emails included at least 9 customers with addresses in Nevada. This is sufficient to satisfy the "interstate commerce" element. See, e.g., Sec. & Exch. Comm'n v. Recycle Tech, Inc., No. 12-21656-CIV, 2013 WL 12063952, at *7 (S.D. Fla. Sept. 26, 2013) (finding the "interstate commerce" element satisfied where the representations at issues were made through the internet); see also Sec. & Exch. Comm'n v. USA Real Est. Fund 1, Inc., 30 F.Supp.3d 1026, 1035

1   (E.D. Wash. 2014) ("[Defendant] also made extensive use of the Internet, emails, telephone calls

2   to persons outside Washington . . . to perpetrate his fraud, satisfying the jurisdictional, interstate

3   commerce element.").

4          For the reasons above, the Court grants Plaintiff SEC's motion for summary judgment on

5   these two claims.

6          **B.  Claims Three and Four**

7          Claim Three alleges that Alpine violated Section 15(c)(1)(A) of the Exchange Act, and

8   Claim Four alleges that Doubek and Walsh aided and abetted this conduct. Section 15(c)(1)

9   prohibits brokers and dealers from using any means of interstate commerce "to effect any

10  transaction in, or to induce the purchase or sale of, any security" in over-the-counter transactions

11  and transactions on exchanges of which the broker-dealer is not a member by means of any

12  "manipulative, deceptive, or other fraudulent device or contrivance." 15 U.S.C. § 78o(c)(1). The

13  elements of a § 15(c)(1) claim are the same as a § 10(b) claim. See Sec. & Exch. Comm'n v.

14  Morgan Keegan & Co., 678 F.3d 1233, 1244 (11th Cir. 2012) (citing Sec. & Exch. Comm'n v.

15  George, 426 F.3d 786, 792 (6th Cir. 2005)); see also Sec. & Exch. Comm'n v. Monarch Funding

16  Corp., 192 F.3d 295, 308 (2nd Cir.1999) (finding that the standard for establishing violations of

17  § 17(a) of the Securities Act and § 15(c)(1) of the Exchange Act are "[e]ssentially the same"). To

18  state a securities-fraud claim under these provisions, a plaintiff must allege "(1) a material

19  misrepresentation or materially misleading omission, (2) in connection with the purchase or sale

20  of a security, (3) made with scienter." Morgan Keegan & Co., 678 F.3d at 1244 (citing Sec. &

21  Exch. Comm'n v. Merch. Cap., LLC, 483 F.3d 747, 766 (11th Cir. 2007)). Since the elements are

22  the same and the Court has already held that Alpine violated § 10(b) of the Exchange Act and

23  Securities Act § 17(a) in conducting the Forced Sales, they arguably violated § 15(c)(1)(A) of the

24  Exchange Act. However, Defendants are seeking partial summary judgment to the extent that the

25  SEC also alleges that Alpine violated § 15(c)(1)(A) of the Exchange Act through their actions in

26  transferring allegedly "abandoned" securities.

27          *i.  Material Misrepresentation or Materially Misleading Omission.*

28          Walsh began the Abandoned Securities Transfers on June 7, 2019, the same day that the

June 2019 Notice circulated within Alpine, stating: "All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state." This constituted a false statement as Alpine has failed to present any evidence that they took steps to actually determine if any of the 645 positions had truly been abandoned by the customers before transferring them. Additionally, Alpine sent out an auto-reply message to its customers giving the false impression that customer property had already been transferred to state authorities when Alpine told customers: "Please contact your state for instructions on how to reclaim your assets." However, the property had not yet been transferred to the state.

### ii.   In Connection with the Purchase or Sale of a Security.

Here is where the primary dispute between the Parties lies. The Parties agree that the internal transfer of the abandoned securities accounts does not constitute a purchase or sale of a security. However, the SEC argues that this is not required for a §15(c) claim, which more broadly refers to attempts to "induce" the purchase or sale of a security. The Court considers the plain language of the statutes. Section 10(b) prohibits, among other things, the use "*in connection with the purchase or sale of any security* . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b) (emphasis added). Similarly, § 17(a) prohibits the exact same conduct in the offer, *purchase, or sale of securities* through instruments of interstate commerce. See 15 U.S.C. § 77q(a). However, § 15(c) of the Exchange Act prohibits a broker or dealer from using "any manipulative, deceptive, or other fraudulent device or contrivance" in order "*to induce or attempt to induce the purchase or sale of[ ] any security.*" 15 U.S.C. § 78o(c)(1) (emphasis added). Therefore, the plain language of § 15(c) reflects that it includes conduct that induces or attempts to induce the purchase or sale of a security.

The SEC presents undisputed evidence that the transfer of the abandoned securities was in order to induce the sale of these securities. For example, Doubek confirmed that he helped customers who complained about the Abandoned Securities Transfers restore their position to their account if the customer agreed to take possession of the securities or to sell the position. Additionally, Walsh testified: "Doubek instructed me that he wanted to liquidate marketable

1    securities to cover debits, that he did not want to just escheat them all, he wanted to actually

2    liquidate marketable securities. . . ." Therefore, transferring the abandoned securities was part of

3    the scheme to force sales.

4              *iii.    Made with Scienter.*

5          Doubek and Walsh both labeled the accounts abandoned and notified customers that they

6    were abandoned. They also told them to contact their respective states, even though they: (i.) had

7    not analyzed whether the customers' accounts were abandoned and (ii.) had not transferred the

8    property to the state. For the reasons described above, their scienter is imputed to Alpine.

9              *iv.    Doubek and Walsh Aided and Abetted Alpine's Section 15(c)(1)(A) Violation.*

10         In order to establish accomplice liability, the SEC must establish that the aider-abettor had

11   knowledge of the primary violation and knowingly and substantially participated in that

12   wrongdoing. See Sec. & Exch. Comm'n v. Ehrenkrantz King Nussbaum, Inc., No. 05 CV 4643,

13   2012 WL 893917, at *14 (E.D.N.Y. Mar. 15, 2012). Doubek and Walsh's knowledge of the

14   wrongful conduct is evidenced by: (i.) their discussion of the "possible options" they had to close

15   remaining accounts and (ii.) Walsh's rehashing of the guidance from a Utah-state securities

16   regulator to use the relevant portions of the Customer Agreement to close accounts. They then

17   went on to transfer the accounts without authorization from the customers, communicating to the

18   customers, or analyzing whether the accounts were abandoned.

19         For the reasons above, the Court grants Plaintiff SEC's motion for summary judgment on

20   these two claims and denies Defendants' motion for partial summary judgment on these same

21   claims.

22         **C.  MOTION TO DISMISS**

23         Almost two years ago, in August of 2023, this Court rejected a nearly identical motion to

24   dismiss by Defendant Doubek. The Court again denies this duplicative, belated motion. An

25   agency's decision not to bring an enforcement action against a person or entity is "presumed

26   immune from judicial review." Heckler v. Chaney, 470 U.S. 821, 832 (1985). Accordingly, "courts

27   have generally concluded that defendants cannot employ Rule 19 to force the [agency] to sue other

28   parties or face dismissal in enforcement actions." Sec. & Exch. Comm'n v. Norstra Energy Inc.,

No. 15cv4751, 2016 WL 4530893, at *1 (S.D.N.Y. Jan. 19, 2016) (collecting cases). A defendant "may not circumvent the exercise of agency discretion through compulsory joinder rules." Sec. & Exch. Comm'n v. Princeton Econ. Int'l Ltd., No. 99 CIV 9667 RO, 99 CIV 9669 RO, 2001 WL 102333, at *1 (S.D.N.Y. Feb. 7, 2001). The Court finds that Mr. Doubek has not shown why this Court should depart from the general principle that Rule 19 joinder does not apply to SEC enforcement actions. Mr. Doubek has not shown (nor does he appear to argue) that the SEC's decision was "so extreme as to amount to an abdication of its statutory responsibilities." Chaney, 470 U.S. at 833 n.4. Here, the SEC exercised its exclusive discretion and brought this enforcement action against Alpine and Alpine's former CEO and COO, who were in management positions at the time the alleged misconduct took place. See generally 15 U.S.C. § 78u(d)(1); Princeton Econ. Int'l Ltd., 2001 WL 102333, at *1 ("The SEC and the CFTC are the sole architects of their enforcement proceedings . . . ."). For these reasons, the Court again denies Defendant's motion to dismiss.

## V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 81) is **GRANTED**. The Court shall set a hearing for November 17, 2025, at 2:30 P.M. to review the remedies to be imposed based upon the Court's findings in this Order.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment (ECF No. 87) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss (ECF No. 103) is **DENIED.**

**DATED:** September 30, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**